**KENTUCKY UTILITIES COMPANY,**
Plaintiff-Appellant,

v.

**TENNESSEE VALLEY AUTHORITY,** Powell Valley Electric Co-operative, Edward J. Hardin, individually, and as Mayor of Tazewell, Tennessee, and James B. DeBusk, individually, and as Mayor of New Tazewell, Tennessee, Defendants-Appellees.

No. 16491.

United States Court of Appeals
Sixth Circuit.

Nov. 15, 1966.

Certiorari Granted March 27, 1967.

See 87 S.Ct. 1284.

Edwards, Circuit Judge, dissented.

Malcolm Y. Marshall and James S. Welch, Louisville, Ky. (Ogden, Robertson & Marshall, Louisville, Ky., John A. Rowntree, Fowler, Rowntree & Fowler, Knoxville, Tenn., James D. Estep, Jr., Tazewell, Tenn., on the brief), for appellant.

Paul A. Sweeney for United States Dept. of Justice, Washington, D. C.

Philip P. Ardery, Louisville, Ky., for Tazewell and New Tazewell, Tenn.

Charles J. McCarthy, Knoxville, Tenn., (Clyde Y. Cridlin, Jonesville, Va., on the brief for Powell Valley Electric Cooperative; Robert H. Marquis, Thomas A. Pedersen, Lewis E. Wallace, Knoxville, Tenn., of counsel), for Tennessee Valley Authority and Powell Valley Electric Cooperative.

William R. Stanifer, Tazewell, Tenn., Philip P. Ardery, Brown, Ardery, Todd & Dudley, Louisville, Ky., for defendants-appellees, Tazewell and New Tazewell.

S. Eason Balch, Jesse S. Vogtle, Martin, Blach, Bingham & Hawthorne, Birmingham, Ala., for Alabama Power Company, Amicus Curiae.

Herbert B. Cohn, American Electric Power Service Corporation, New York City, for Appalachian Power, Amicus Curiae.

W. Reid Thompson, Charles F. Rouse, Raleigh, N. C., for Carolina Power & Light Co., Amicus Curiae.

Carl Horn, Jr., William I. Ward, Jr., Charlotte, N. C., for Duke Power Co., Amicus Curiae.

William H. Schroder, Harold C. McKenzie, Jr., Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., for Georgia Power Co., Amicus Curiae.

Herbert B. Cohn, New York City, for Kingsport Power Co., Amicus Curiae.

James S. Eaton, Eaton A. Lang, Jr., Eaton, Cottrell, Galloway & Lang, Gulfport, Miss., for Mississippi Power Co., Amicus Curiae.

Sherwood W. Wise, Richard B. Wilson, Jr., Wise, Smith & Carter, Jackson, Miss., for Mississippi Power & Light Co., Amicus Curiae.

John W. Douglas, Asst. Atty. Gen., Paul A. Sweeney, Sp. Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Ernest W. Rivers, U. S. Atty., Louisville, Ky. (Curtis H. Bell, Field Solicitor, Department of the Interior, Washington, D. C., of counsel) for the United States, Amicus Curiae.

Before O'SULLIVAN and EDWARDS, Circuit Judges, and CECIL, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Eastern District of Tennessee, Northern Division, dismissing a complaint for injunctive relief. Plaintiff-appellant, Kentucky Utilities Company, a Kentucky Corporation (hereafter KU) had sought to have Tennessee Valley Authority (hereafter TVA), Powell Valley Electric Cooperative, a TVA distributor (hereafter PVA), and the respective mayors of the cities of Tazewell and New Tazewell, Tennessee, restrained from taking over KU's electric customers in the area of Tazewell and New Tazewell, and generally to restrain TVA and PVA from taking over the supply of electric power to those Tennessee cities.

KU's asserted ground for relief was its claim that it was and had been, before and after July 1, 1957, the primary source of electric power to the consumers in the Tazewells; that in 1963 and prior thereto the municipal authorities of the Tazewells made plans and "conspired" with TVA and PVA to introduce additional TVA power into the area and had commenced to take over KU's customers; and that all of such plans and conduct were and would be violative of an amendment added in 1959 to the Tennessee Valley Authority Act as Section 15d thereof, (Public Law 86–137; 73 Stat. 280), which in subsection (a) provides that,

"Unless otherwise specifically authorized by Act of Congress the Corporation [TVA] shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a source of power supply *outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957* * * *." (Emphasis supplied.) Title 16 U.S.C.A. § 831n–4 (a).[1]

---

1. The 1959 Act authorized TVA to issue and sell bonds in an amount not exceeding $750,000,000 outstanding at any one time, "to assist in financing its power program," but burdened such authority with defined restrictions. We consider that only that portion of the restrictions quoted above is relevant here, but both litigants claim support for their respective positions in the various provisos that follow the quote. We set out the entire restrictions as follows:

"Unless otherwise specifically authorized by Act of Congress the Corporation shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a

On the critical date, July 1, 1957, KU and PVA were both supplying power in the involved municipalities, but KU supplied 561 customers out of a total of 589, or 95.3% thereof, PVA serving the remaining 28 customers. In the month of June, 1957, KU supplied 228,087 KWH of electricity out of a total 242,853, or 93.9% thereof, PVA supplying the balance of 14,766 KWH. As found by the District Judge, "On August 6, 1959, the day the Act in question became effective, KU in Tazewell supplied 371 customers to Powell Valley's 19 and in New Tazewell, KU supplied 256 customers to Powell Valley's 12. In the two towns combined, KU supplied a total of 627 customers to Powell Valley's 31." It was the contention of KU that the foregoing and other evidence established that the cities of Tazewell and New Tazewell were "outside the area for which the [TVA] or its distributors were the primary source of power supply on July 1, 1957", and that TVA and PVA were forbidden additional entry into the area. In defense, TVA and PVA asserted that the basic "area" should not be limited to that part of Tennessee in which KU was the primary source of power, but should encompass that larger portion of Tennessee, including all of Claiborne County, in which TVA and its distributors were in total the primary source of power. In Claiborne County, in which the Tazewells were located, two TVA distributors, PVA and the City of LaFollette Electric System, were suppliers. KU also supplied power outside of the Tazewells along a corridor extending into Tennessee from an area of Kentucky wherein KU was also the primary, if not the exclusive, source of power. While PVA and LaFollette Electric System together may have exceeded KU in customers and power delivered, KU was the largest single source of power supply in the whole of Claiborne County. The District Judge found that in Claiborne County:

"As of July 1, 1957, Powell Valley and the City of LaFollette Electric System (the other TVA supplier for Claiborne County) supplied power to a total of 3,564 consumers in Claiborne County and KU supplied power to 1,839 consumers. In June, 1957 Powell Valley and LaFollette had combined kilowatt-hour sales of 1,025,793 as against 626,043 kilowatt-hours for KU. In the same month, the combined kilowatt de-

source of power supply outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area: *Provided, however,* That such additional area shall not in any event increase by more than 2½ per centum (or two thousand square miles, whichever is the lesser) the area for which the Corporation and its distributors were the primary source of power supply on July 1, 1957: *And provided further,* That no part of such additional area may be in a State not now served by the Corporation or its distributors or in a municipality receiving electric service from another source on or after July 1, 1957, and no more than five hundred square miles of such additional area may be in any one State now served by the Corporation or its distributors.

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act.

"Nothing in this subsection shall prevent the Corporation, when economically feasible, from making exchange power arrangements with other power-generating organizations with which the Corporation had such arrangements on July 1, 1957, nor prevent the Corporation from continuing to supply power to Dyersburg, Tennessee, and Covington, Tennessee, or from entering into contracts to supply or from supplying power to the cities of Paducah, Kentucky; Princeton, Kentucky; Glasgow, Kentucky; Fulton, Kentucky; Monticello, Kentucky; Hickman, Kentucky; Chickamauga, Georgia; Ringgold, Georgia; Oak Ridge, Tennessee; and South Fulton, Tennessee; or agencies thereof".

mand for Powell Valley and LaFollette was 3,125 kilowatts as against 2,338 for KU. The depreciated plant investment in distribution facilities of Powell Valley and LaFollette (as of January 10, 1957 for Powell Valley and as of June 30, 1957 for LaFollette) was $902,999.17 as against KU investment on June 30, 1957 of $457,947.93." 237 F.Supp. at 513.

There was evidence that KU was also the primary source of power in the area of its corridor outside of the Tazewells and that its corridor had a total area of about 60 square miles.

The meritorious issue before the District Judge was whether, as contended by KU, and within the meaning of the 1959 Act, the cities of Tazewell and New Tazewell were outside the area wherein TVA or its distributors were the primary source of power on July 1, 1957.[2] In addition to their defense on the merits, defendants-appellees pleaded that plaintiff lacked standing to maintain the action. The District Judge concluded that plaintiff had standing to sue but held for defendants on the merits. Kentucky Utilities Company v. Tennessee Valley Authority, 237 F.Supp. 502 (E.D.Tenn.N.D. 1964).

Defendants-appellees reassert here their defense that plaintiff was without standing to sue, and ask that the judgment of dismissal be affirmed on such ground, regardless of the merits. We defer threshold discussion of this question, believing that the reasons which prompt our disposition of it will be more clearly exposed by our consideration of the merits.

■ We sustain the District Judge's denial of the standing to sue defense, but reverse the judgment which dismissed the cause on the merits.

There is little controversy over the essential and dispositive facts, although the litigant adversaries differ as to their significance. Plaintiff Kentucky Utilities Company is an investor-owned electric public utility, serving customers in about two-thirds of the State of Kentucky, in Claiborne County, Tennessee, and through a subsidiary, in four counties in southwest Virginia. Its transmission lines serving this entire area constitute an integrated and continuous system, and all parts of the area served are substantially contiguous. Its Claiborne County, Tennessee, area begins at an area served by it in the State of Kentucky, adjacent to that state's southerly line and then extends along and within a peninsula or corridor into Claiborne County, Tennessee, 15 or so miles to include the cities of Tazewell and New Tazewell. The record before us leaves us uncertain as to the exact width of this corridor and indeed at one point its width and contiguity with the adjoining area may be limited to the dimension of a transmission line at a point where a transmission line of PVA crosses it. This KU corridor is bounded on the east, south and west by TVA distributors and on the north by the main area served by KU itself.

KU's activity in the above area began as early as 1919 and from 1920 it has been serving customers in Tazewell and New Tazewell, which localities became incorporated as cities of Claiborne County in 1954. KU has a non-exclusive franchise to provide electricity to customers in all of Claiborne County. The fixed corporate limits of Tazewell and New Tazewell define the area in which KU on July 1, 1957, was the primary source of the electric power consumed therein. Beginning in 1961 and 1962, citizens and officials of Tazewell and New Tazewell were attracted to the apparently lower rates of PVA,[3] which is a distributor of TVA power in adjacent areas and with the few customers in the Tazewells above

---

2. Plaintiff's complaint also charged all defendants with conspiracy to illegally deprive it of its property in the area in question. The District Judge dismissed this claim and it is not presented by the appeal before us.

3. KU contends that, properly analyzed, its rates are not less economical to their customers than PVA rates. Resolution of this question, however, is not necessary to our decision.

referred to. After meetings between representatives of these cities and of Claiborne County with TVA and PVA officials, the two towns decided to set up municipal electric systems which would purchase power from PVA at wholesale rates and re-distribute it. The cities' offer to buy the facilities of KU was refused. Activity toward establishing a municipal system then began, but up to the start of this lawsuit this activity consisted of disconnecting KU's line to several of its consumers and reconnecting them to PVA.

This case was started on November 7, 1963, and any activity thereafter by PVA and TVA in the Tazewells has been suspended in obedience to an order of the District Court.

### 1. *The merits.*

The meritorious and controlling question is whether Tazewell and New Tazewell were "outside the area for which the Corporation [TVA] or its distributors were the primary source of power on July 1, 1957".[4] The litigants' pleadings presented issues of fact and law to the District Judge, but as discussed hereinafter we do not consider that there was a real controversy over the basic facts. Decision of the case involves determination of the relevant "area" within which TVA or its distributors constituted "the primary source of power supply on July 1, 1957". If the relevant area does not include the towns of Tazewell and New Tazewell, then TVA and PVA were, by the 1959 Act, foreclosed from making further contracts for power supply therein. TVA's position that "it and its distributors were the primary source of power supply in the two Tazewells on July 1, 1957" is supportable only if it is

permitted to dilute KU's clear primacy in the Tazewells by detaching them from KU's total and contiguous area of service and making them an integral part of territory in which TVA was dominant.

On August 26, 1964, after the issues had been drawn and shortly before trial, the TVA Board of Directors adopted the following resolution:

> "That the Board of Directors hereby finds and determines that all of Claiborne County, Tennessee, is within the area for which TVA or its distributors were the primary source of power supply on July 1, 1957."

Numerous maps put in evidence showed that KU's corridor into Tennessee was contiguous to its larger area of service in Kentucky and Virginia which admittedly was no part of TVA's service area. The TVA Board's resolution determined that the *periphery* of its area of primary power supply was along the easterly line of Virginia and the southerly line of Kentucky, thus cutting off KU's corridor of power supply in Tennessee from the balance of its area of service. The Board resolved:

> "That the Board finds and determines that a line beginning at the intersection of the States of Tennessee, Virginia and Kentucky and running first south and then west along the line separating Tennessee and Kentucky to the line dividing Claiborne and Campbell Counties, Tennessee [Campbell County abuts on Claiborne on the west] is part of the periphery of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957, and is that part of such periphery which touches Claiborne County, Tennessee." [5]

---

4. We need not consider whether, consistent with the 1959 Act, the Tazewells were part of an "additional area extending not more than five miles around the periphery of such area as may be necessary to care *for the growth of the Corporation and its distributors within said area.*" (Emphasis supplied.) Neither TVA nor PVA contends that taking over

the power distribution in the Tazewells is necessary for the growth of TVA within the area contiguous to the Tazewells if the Tazewells are actually outside of the area for which TVA or PVA were the primary source of supply on July 1, 1957.

5. KU contends that the periphery of the area in which TVA was the primary

We consider that the District Judge's conclusion was bottomed primarily upon his acceptance of the TVA resolution as dispositive of the case. His opinion recites:

> "The finding of the Board was made in good faith and supported by substantial evidence.
>
> "The history of the 1959 Act supports the finding of the TVA Board that Tazewell and New Tazewell were within the primary area served by TVA and its suppliers as of July 1, 1957. We do not believe that Congress in the 1959 Act intended to exclude the two Tazewells from the primary service area served by TVA and its suppliers as of July 1, 1957. U. S. v. Burleson [D.C.], 127 F.Supp. 400."

a) Legislative history.

Examination of the legislative history of the 1959 Act has helped our resolution of the question before us. In 1955, TVA was faced with the prospect of rapidly increasing demands for power for its existing customers. It sought a way to meet the cost of new facilities without dependence upon annual national budget considerations. It suggested that Congress give it the power to issue bonds to private and public investors to finance the development. In this effort Senate Bill 2373, 84th Congress, 1st Session (1956) was introduced. This bill contained no territorial limits to the expansion that TVA could accomplish with the proceeds of the bonds. Gabriel O. Wessenauer, Manager of Power for TVA, spoke for it before the Congressional Committees which considered legislation that was proposed. He made it clear that territorial expansion was not contemplated, but that TVA sought power and finances to insure sufficient capacity to accommodate the growth of the system load. Cf. Hearings, Senate Committee of Public Works, 84th Congress, 1st Session, S 2373, pp. 65, 79 (1956). The Committee understood this to be TVA's limited

objective. Senator Cotton remarked, "Its [TVA's] purpose is to have growth rather than expansion in that you may have more electricity, more power to serve the territory that you presently serve." Id. at 114. At the time this legislation was under consideration, the area served by TVA and its distributors had more or less stabilized; this area comprised all of the State of Tennessee except the peninsula or corridor involved here (and some other areas not of materiality here) as well as parts of Kentucky, Virginia, Georgia, Alabama and Mississippi bordering on Tennessee. The history of troubles and collisions between TVA and private power companies was of course known to Congress, but a degree of repose had existed for some time. Congress, as the source of money, had exercised power over TVA's geographic growth, but possession by TVA of authority for self-financing might indeed call for substitute controls upon its expansion. S 2373 was never passed, and two years later, in 1958, two new bills, H.R. 3236 and H.R. 4266, 85th Congress, 1st Session, were proposed. These bills also made no provision for any territorial limitations. This was a cause of concern to some members of Congress. A typical inquiry was, "Can the TVA Directors issue bonds to expand its area outside of the district now covered by TVA?" An answer was made, " * * * there has not been a single instance in the history of this Committee in which the Tennessee Valley Authority has gone in to 'raid' any utility's territory." Hearings, House Committee on Public Works, 85th Cong. 1st Sess., H.R. 3236 and H.R. 4266, p. 16 (1958). TVA's Wessenauer added "We have not run any parallel lines for 10 to 20 years." Id. at 94. A statement by a representative of the private power companies that the bill posed the "threat of geographic as well as capacity expansion" was dismissed by a supporter of the bill

---

source of supply should follow the lines which mark the outer limits of such area and in this case it should have

dipped down into Tennessee so as to exclude the corridor in which KU was the primary source of power supply.

as the raising of an old "bogey." Id. at 156–159.

After the above bills failed of enactment, four new ones were introduced into the Senate: S 1855 which proposed to limit TVA to its "service area" as of July 1, 1957; S 1869 which merely required TVA to allow Congress 60 days to veto any proposed expansion before beginning it; S 1986 which would have limited TVA to replacing existing facilities; and S 2145 which would have required congressional approval for any expansion. Although none of these bills became law, it had become apparent that definition and imposition of some limitation on TVA growth was going to have to be a part of any successful bill.

In 1959, H.R. 3460, which ultimately became the 1959 TVA Act, was introduced. As offered, this bill would have limited TVA to "counties lying in whole or in part within either the Tennessee River drainage basin or the service area in which power generated by the Corporation is being used on July 1, 1957." During the hearings before the House Public Works Committee, Rep. Vinson proposed an amendment to limit TVA solely to its July 1, 1957, service area, and with some minor amendments to make provision for peripheral adjustment and a slight change of language, this ultimately became a part of the Act.

In discussing the intent of his amendment, Rep. Vinson referred to the existence of various accommodations which had been reached dividing and delineating the areas of service between the Alabama Power Corporation and TVA, between the Georgia Power Co. and TVA,

and indeed in our own case between KU and PVA.[6] See Hearings, Senate Committee on Public Works, 86th Cong., 1st Sess., S 931 and H.R. 3460, pp. 39–51, 220 (1959). Rep. Vinson stated that his amendment "writes into the law the 'gentlemen's agreement.'" Hearings, House Committee on Public Works, 86th Cong., 1st Sess., H.R. 3460, p. 111 (1959).

Three months later, H.R. 3460 was before the Senate Committee, together with S 931, a bill which more or less conformed to the version of H.R. 3460 originally submitted to the House Committee. The threat of possible expansion of TVA under S 931 excited numerous and vigorous protestations from representatives of power companies, whose statements consume some 70 pages of the report. Senate Committee on Public Works, 86th Cong., 1st Session, S 931 and H.R. 3460, pp. 170–240 (1959). Ultimately, S 931 was rejected, and H.R. 3460 was reported out and passed.

In the Senate report (No. 470, 86th Cong., 1st Sess., 1959) on the final version of H.R. 3460, the Senate noted:

"Although there has been no *statutory* boundary established, there has been no material increase for about 15 years in the area supplied by power from TVA. It was generally agreed by many that the working arrangement that now exists with respect to this area was satisfactory and no area limitation was required. *Others believed, however, that the stabiization area should be defined and limited by law.*" U.S.Code Congressional and Administrative News, 86th Cong., 1st

---

6. In 1958 a written agreement was made between KU and TVA's distributor, PVA. Fairly read, this agreement provided that KU and PVA would mutually avoid "raiding" customers in their respective areas. To insure understanding and delineation of such areas, engineer representatives of KU and PVA collaborated in the preparation of a map which, upon its completion in 1960, showed the Tazewells as part of the territory in which KU was the primary source of power. After the activity to have additional TVA power

brought into the Tazewells, PVA gave notice of termination of its 1958 agreement with KU. With reference to some new projects then contemplated for the Tazewells, a TVA District Manager, on October 18, 1962, recited in a memorandum to TVA's Director of Power Marketing that "Under the territorial agreement between the Cooperative [PVA] and KU, effective January 16, 1958, *both of these projects are in KU's territory.*" (Emphasis supplied).

Sess. 1959, p. 2007. (Emphasis supplied.)

The "others" were those who supported the Vinson Amendment which become a part of the bill.

From all of this it is apparent that Congress intended that in exchange for the free hand it was giving TVA in financing further development, it required that such development was to be kept within "the area for which [it] * * * or its distributors were the primary source of power supply on July 1, 1957". The language of Congress was clear and the "area" to which TVA was to be confined was ascertainable from conditions which existed on the critical date of July 1, 1957.

■■ But, TVA argues, the 1959 Act must be read as committing to its Board of Directors authority to determine "the area" in which it was the primary source of power on that date. We find no words in the Act which directly or impliedly delegated to TVA's Board such authority. From the evidence in this record, we are convinced that as a matter of undisputed fact the cities of Tazewell and New Tazewell were, on July 1, 1957, a part of and *within* the total area served by KU and in which KU was the primary source of power supply. If so, they were *outside* of the area in which TVA or PVA were such primary source, and the latter were therefore statutorily forbidden from therein making contracts "for the sale or delivery of power."

■ The District Judge arrived at his decision primarily upon acceptance as having been made in good faith and on substantial evidence, the resolution of the TVA Board of Directors, made on the eve of trial, that the Tazewells were within the TVA area. If such acceptance of the Board's resolution amounts to a finding of fact, we consider that it was clearly erroneous. Fed.R.Civ.P. 52(a).

■ TVA argues that because several maps purporting to disclose the area of its service, which it furnished to the Congressional Committees considering the legislation, showed all of Claiborne Coun-

ty as within said area and did not disclose KU's corridor into Tennessee, it should be assumed that Congress by its Act made all of the County a part of "the area" of TVA. On trial, however, TVA's witnesses conceded that these maps were intended to be only "rough approximations" of its total area. The evidence disclosed that they failed to portray the numerous places where peninsulas or corridors contiguous to and parts of non-TVA areas intruded across the perimeter of and into the area portrayed as being exclusively that of TVA.

b) Other evidence indicating the area of TVA-supplied power.

We have detailed above undisputed evidence that KU's corridor which included the Tazewells was contiguous to an area of Kentucky in which KU was not only the primary but the exclusive source of power supply. This was also confirmed by maps annually prepared by TVA to portray its "Transmission System." These maps covered years prior and subsequent to 1957, and subsequent to the effective date of the 1959 Act. In each of these maps, the KU corridor was shown as a continuation of KU's area in Kentucky and not as part of TVA's area. The corridor's boundaries and outline were not precisely delineated and New Tazewell was not shown as within the intruding corridor, but it is not claimed that New Tazewell was in fact outside the corridor. There was also in evidence a detailed map prepared in 1960 by the joint work of engineers for KU and PVA (the "Rowe-Osborne" map) which precisely delineated the line which separated the respective areas of these utilities. The Tazewells were within KU's area which extended north to the Tennessee-Kentucky line and the Tennessee-Virginia line. On the Tennessee side of the Kentucky-Tennessee line are Cumberland Gap and other municipalities in which KU was the exclusive source of power. The TVA Board resolution, however, determined that the "periphery" of TVA's area was along the northerly line of Claiborne County which is the Kentucky-Tennessee state line—this notwithstand-

ing that the area in which KU was either the exclusive or primary source of electric power lay on both sides of the "periphery" adopted by its Board. Thus the Board "lopped off" from KU's area its corridor extending into Claiborne County and resolved that all of Claiborne County, including the Tazewells, was part of "the area" in which TVA was the primary source of electric power.

Among the map exhibits was one prepared by TVA in 1952 and delivered to KU's power engineers with a letter from one DeMerit, TVA's Chief Power Engineer. The letter described the map as "showing the areas now served by the LaFollette Electric Department, the Powell Valley Electric Cooperative and the Kentucky Utilities in the *Cumberland Gap-Tazewell Section of Tennessee.*" (Emphasis supplied.) The map, Exhibit 36, shows the KU corridor extending without break and with substantial width from KU's area in Kentucky and Virginia southerly to and including the Tazewells.[6a]

It appears to us that except for the maps presented to the Congressional Committees as "rough approximations," the maps prepared by TVA engineers, or in the making of which they collaborated, and the physical facts could be consistent only with a finding that the Tazewells on July 1, 1957, were outside of an area in which TVA was the primary source of power. We are persuaded also that TVA's "rough approximation" maps were not intended to deal specifically with KU's relatively small peninsula extending as a part of its total area into Tennessee. Until about 1960 when the activity to have TVA take over the supply of power to the Tazewells commenced, all of TVA's own activities were consistent only with the conclusion we have reached. Its Board's resolution, adopted to sustain its position in this lawsuit, could not change the facts.

█ We should make clear that we are not deciding whether the involved 1959 Act would forbid TVA from entering into or expanding its service within areas served by private utilities where such areas are but islands within a larger area in which TVA is primary. Tazewell and New Tazewell are not such islands, but are attached to the "mainland" of KU's area of primary service. The fact that a line or lines of PVA may at one or more points enter into this corridor or, as the evidence shows, at one point cross one of KU's transmission lines, does not make islands of Tazewell and New Tazewell. We do not consider that the District Judge's recitation that:

> "KU referred to this location throughout the trial as a corridor or peninsula served by it. Maps show that the lines of Powell Valley crossed the lines of KU at one point in the so-called corridor. Some maps also show that the lines used to serve Powell Valley customers surround the towns. The TVA prepared maps over a period of years which showed that KU served Tazewell and New Tazewell."

was a finding of fact that the Tazewells were "islands."

█ There was evidence that it would be economically advantageous to consumers in the Tazewells to receive their power from TVA, either directly from PVA or through municipally owned systems. Whether TVA is in good faith seeking to help the citizens of Tazewell and New Tazewell obtain the benefits which flow from TVA is an irrelevant question here. We hold that the 1959 Act now forbids the involved expansion of TVA.

c) Reviewability of TVA Board's determination.

Appellees assert that the District Judge made his own finding of fact on the critical issue, independently of the

---

6a. This is the same Exhibit 36 which is attached to the dissent. The dissent asserts that it portrays "KU's view of the same problem * * *." This is true, but as pointed out in the above text, this map was the production, not of KU engineers, but was made by *TVA* engineers to show *their* view of the areas served by the respective utilities.

TVA Board's finding, and that under 52(a) Fed.R.Civ.P., such finding binds us, absent a valid conclusion by us that his finding of fact was clearly erroneous. We read the District Court opinion, however, as accepting the TVA Board's resolution as dispositive of the case, but if his decision in total amounts to a finding of fact, we consider it erroneous within the meaning of the mentioned rule.

As an alternative position, TVA contends that the 1964 resolution of its Board of Directors, made for the purpose of and on the eve of trial, was beyond judicial review. It is clear that such resolution was the product of advice provided by memoranda presented by TVA's Manager of Power, Mr. Wessenauer, and its General Counsel. The "rough approximation" maps which Wessenauer had presented to the Congressional Committees accompanied his memorandum. He advised the Board:

> "The approximate location of the periphery of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957, is reasonably clear, but to draw a precise line at any location requires a detailed study of the operations of each distributor with lines at that point. It has not been thought that the advantages to be derived from drawing a precise line around the periphery of the entire area served by TVA power would justify the time and expense involved in making the necessary studies."

With reference to his Congressional Committee maps, he said:

> "The maps cannot be relied on to determine exact lines but they show the general area which Congress had in mind as the service areas of such distributors. Each of the maps shows all of Claiborne County as within the area served by TVA."

The General Counsel's memorandum included the following:

> "The determination of the exact dimensions of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957, and the fixing of the periphery of such area in situations in which a line must be drawn in the administration of the TVA Act is a responsibility which Congress has placed on the TVA Board.

> \*   \*   \*   \*   \*   \*

> "The question then is one of determining the periphery of the area. From Mr. Wessenauer's memorandum and the attached maps it appears that everything south and east of Cumberland Mountain (as well as the extreme northwestern part of the County) with the possible exception of the area around Cumberland Gap, is within the periphery of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957. "A closer question is whether the periphery should be drawn to include all of Claiborne County or should dip down to include Mingo Hollow and again to exclude the area in the vicinity of Cumberland Gap. This is a matter for the Board to decide. It is my view that, considering the relatively small area included in these portions of the county, and the legislative history showing an understanding by the Congress that all of Claiborne County was within the TVA area, the Board can properly resolve this question by finding that all of Claiborne County is within the area for which TVA or its distributors were the primary source of power supply on July 1, 1957,[7] and can properly define as part of the periphery of such area a line from the intersection of Tennessee, Virginia and Kentucky along the Kentucky-Tennessee border to the line separating Claiborne and Campbell Counties."

7. H.R. 3460, as originally presented, indicated an intention to use *counties* as the area within which to determine the controlling service area. But such language was eliminated in the final draft.

Appellees support their argument on this point by citing cases which hold that where Congress has committed to a government agency the responsibility for making determinations preliminary to executive or administrative action, such determinations are beyond judicial review. We, however, do not find that Congress, directly or indirectly, left it to TVA to determine "the area for which [it was] the primary source of power supply on July 1, 1957." Whether the Tazewells were or were not outside such area depended upon existing, unchangeable and ascertainable facts, and not upon discretionary or administrative action of the TVA Board. If, in fact, the Tazewells were outside the area where TVA was primary, a contrary resolution by the TVA Board could not change the fact.

Leading cases supporting the doctrine invoked by appellees are Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Decatur v. Paulding, 14 Pet. 497, 10 L.Ed. 559 (1840); United States ex rel. Dunlop v. Black, 128 U.S. 40, 9 S.Ct. 12, 32 L.Ed. 354 (1888); Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). We will not attempt review of these and other cases cited, other than to observe that they involved the responsibility and right of executive and administrative agencies to make determinations essential to the exercise of granted power. The portion of the 1959 statute before us gave TVA authority to finance its development by issuance of bonds, but imposed specific restraints upon the future activities of TVA. We consider that the language of restraint was clear and did not need interpretation, discretionary or otherwise. Enforcement of the restraint is a judicial function. Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944); Peters v. Hobby, 349 U.S. 331, 345, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). The District Judge did hold that the finding of the TVA Board was subject to his review and

notwithstanding his reliance on the Board's resolution said:

"It is the duty of the Court to construe the Act and to determine whether TVA acted within its authority under the Act. Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733; National Bank of Detroit v. Wayne Oakland Bank, supra [252 F(2) 537 (CA6, 1958) cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69]; Civil Aeronautics Board v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869."

We hold that the resolution of the TVA Board did not foreclose the testing of its validity by the District Judge or by this Court on this appeal.

2. *KU's standing to sue.*

KU does not have an exclusive franchise and, accordingly, has no contractual, statutory or constitutional right to be free from competition. KU's complaint, however, does not ask a decree protecting it from all competition. It asks that TVA and PVA be enjoined from violating the 1959 Act by expanding its sale of power into the Tazewells, cities which are outside of TVA's primary area. We are satisfied that the Act's restrictions on TVA expansion were incorporated to protect KU and other established utilities from the destructive consequences of intrusion of TVA power into areas where such utilities had already been established as the primary source of power and which areas were "outside" of TVA's primary area.

The Senate Committee's report reviewing the plan and purpose of H.R. 3460, the bill enacted, recited that among other objectives of its Territorial Limitation was a purpose to "protect the areas now being served by private utilities". U.S. Code Congressional and Administrative News, 86th Congress, 1st Session, p. 2008 (1959). Remarks made by members of Congress make clear that concern for the rights of KU and other utilities in like situations prompted the limitations placed on TVA. Such being so, we believe that the courts are open to KU to

seek protection of the rights which Congress created for it.

Of the cases relied on by appellees on the question of plaintiff's standing to sue, Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Tennessee Electric Power Company v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); and Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (C.A. D.C.1955) cert. den., 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780, speak most directly to the subject. All of them involve efforts by private utilities to get court relief from the competition of publicly owned or supported power facilities which were creatures of the Federal Government's entry into the power business. The right to sue and the asserted ground for relief in each case were bottomed upon broad claims of unconstitutionality of the federal power program, illegality in the means whereby competitors of private utilities had or would obtain the funds to set up their operations and other charges of illegality in the establishment of the plaintiffs' competitors. Such plaintiffs were held to be without standing to sue. Their surface analogy is immediately dissipated by the fact that in none of them was the plaintiff's suit planted on a federal statute enacted specifically for the protection of the involved plaintiff. The plaintiff utilities did not have exclusive franchises, and the cases hold that where there is no constitutional or common law right to be free of competition and where the hurting competition is valid as competition, the courts will not restrain it because of some antecedent illegality in its creation or in its obtaining of funds. Without attempting detailed analysis of the facts of each of these cases and the court's reasoning, we recite language from *Tennessee Electric* which we believe most nearly expresses the theory underlying all three of the cases. Speaking of the plaintiff's assertions, Justice Roberts said:

"This is but to say that if the commodity used by a competitor was not law-

fully obtained by it the corporation with which it competes may render it liable in damages or enjoin it from further competition because of the illegal derivation of that which it sells. If the thesis were sound, appellants could enjoin a competing corporation or agency on the ground that its injurious competition is ultra vires, that there is a defect in the grant of powers to it, or that the means of competition were acquired by some violation of the Constitution."

and Justice Roberts then concludes that "[t]he contention is foreclosed by prior decisions that the damage consequent on competition, *otherwise lawful*, is in such circumstances damnum absque injuria, and will not support a cause of action or a right to sue." 306 U.S. 139, 140, 59 S.Ct. 371, 83 L.Ed. 550, 551. (Emphasis supplied.)

Relying upon these principles, TVA asserts that KU has no right to be free of competition, that the municipalities have the right to set up their own electric power plants to compete with plaintiff and, therefore, it is no business of KU where these municipal systems obtain their power. But KU does not contend that the Tazewells are forbidden such competition with it, and it does not challenge their source of power except—and this is the big distinction here—that it does claim the right to ask judicial enforcement of a limitation on the source of its competitors' power, which limitation Congress made into law for its benefit.

No precedent answers this question precisely, but we believe that there is ample authority for our affirmance of the District Judge's view that plaintiff had standing to sue. In National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, 544 (C.A.6, 1958), where the plaintiff bank charged violation of federal and state statutes by the Comptroller of the Currency's grant of authority to open a branch bank, we said:

"As to the standing of The Wayne Oakland Bank to maintain its suit, it was faced with invasion of property

rights, and injury from a competition which was prohibited by the federal statutes * * *. Whether the rights of a party are infringed by unlawful action of an individual or by exertion of unauthorized federal administrative power, it is entitled to have such controversy adjudicated."

In Stark v. Wickard, 321 U.S. 288, 64 S. Ct. 559, 88 L.Ed. 733 (1944) standing to sue the Secretary of Agriculture by a milk producer who asserted that the Secretary's action offended a statute creating rights in plaintiff was sustained by the Supreme Court which said:

"Here, there is no forum, other than the ordinary courts, to hear this complaint. When * * * definite personal rights are created by federal statute, similar in kind to those customarily treated in courts of law, the silence of Congress as to judicial review is, at any rate in the absence of an administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction. * * * The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. Cf. United States v. Morgan, 307 U.S. 183, 190, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211, [1216, 1217] 321 U.S. at 309–310, 64 S.Ct. at 570, 88 L. Ed. at 747–748.

In Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) dealing with and sustaining a District Court's jurisdiction to hear a complaint which charged the NLRB with illegal conduct, the Supreme Court said:

"This case, in its posture before us, involves 'unlawful action of the Board [which] has inflicted an injury on the [respondent].' Does the law, 'apart from the review provisions of the * * * Act,' afford a remedy? We think the answer surely must be yes. This suit is not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." 358 U.S. 188, 79 S.Ct. 183.

See also, J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Texas & P. R. Co. v. Rigsby, 241 U.S. 33, 39–40, 36 S.Ct. 482, 60 L.Ed. 874, 877 (1916). It would be useless for Congress to include distinct limitations upon the expansion plans of such public corporations as TVA if there was no way to force them to keep within such limitations.

We hold that KU had standing to sue and on the merits should have been accorded appropriate relief. This disposition makes it unnecessary that we consider other contentions made by KU in support of its claim for relief.

Judgment of dismissal is reversed and the cause is remanded for further proceedings consistent herewith.

EDWARDS, Circuit Judge (dissenting).

The majority opinion would in my view construe statutory restrictions in the 1959 Tennessee Valley Authority Act, 73 Stat. 280 (1959), 16 U.S.C. § 831n-4 (1964), much more narrowly than it appears to me Congress intended. The Tennessee Valley Authority sought authority from Congress to issue revenue bonds to expand its facilities for furnishing electric power within the general area served by TVA. The bill proposed by TVA was opposed vigorously by privately owned power companies whose service areas impinged upon TVA's. As a result of this opposition, when the 1959 TVA Act was passed, it contained language generally restricting the areas which TVA could supply to those which it was serving as the primary source of power on July 1, 1957, and to an area no more than five miles outside the perimeter of such area.

The limiting provision follows:

"Unless otherwise specifically authorized by Act of Congress the Corporation shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a source of power supply outside *the area* for which the Corporation or its distributors were the *primary source of power supply on July 1, 1957,* and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area: Provided, however, That such additional area shall not in any event increase by more than 2½ per centum (or two thousand square miles, whichever is the lesser) the area for which the Corporation and its distributors were the primary source of power supply on July 1, 1957: And provided further, That no part of such additional area may be in a State not now served by the Corporation or its distributors or in a municipality receiving electric service from another source on or after July 1, 1957, and no more than five hundred square miles of such additional area may be in any one State now served by the Corporation or its distributors.

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act. * * *" (Emphasis supplied.) 73 Stat. 280 (1959), 16 U.S.C. § 831n-4(a) (1964).

This action is a suit for an injunction by Kentucky Utilities Company against TVA seeking to restrain it from providing electric power to two municipal electric distribution systems in the towns of Tazewell and New Tazewell, Tennessee. The two major parties agree only on the fact that legal construction is needed for the words "area" and "primary source of power" in the first clause of the portion of 16 U.S.C. § 831n-4, the 1959 TVA Act which we have quoted.

Briefly put, it is the contention of KU that its area of service reaches down from Kentucky into Claiborne County, Tennessee, in a narrow peninsula of service along its transmission line, and that it represented the primary source of power supply on July 1, 1957, for the towns of Tazewell and New Tazewell, Tennessee.

Briefly put also, TVA's position is that TVA's power lines, through its subsidiary, Powell Valley Electric Cooperative, criss-crossed all of Claiborne County on the crucial date of July 1, 1957, and served a portion of the Tazewells and plainly, in TVA's contention, represented the primary source of power for Claiborne County.

TVA also points out factually that its transmission line of Powell Valley cut across KU's transmission line rendering KU's Tazewell facilities an island.

TVA's view of the "area" concerned in this matter is portrayed by its Exhibit 91. (Attached hereto following page 27.)

KU's view of the same problem is dramatically different, as shown in Exhibit 36. (Attached hereto following page 27.)

Although it seems unlikely, both exhibits refer to this same dispute and to the same general geographical locality.

It is clear, as the District Judge who heard this case found, that TVA was the dominant supplier of electric power in Claiborne County while KU was the dominant supplier of electric power within the city limits of Tazewell and New Tazewell.[1]

---

1. "As of July 1, 1957, Powell Valley and the City of LaFollette Electric System (the other TVA supplier for Claiborne County) supplied power to a total of 3,564 consumers in Claiborne County and KU supplied power to 1,839 con-

It is also clear that neither of these utilities had any exclusive franchise to serve any territory here in dispute. It is also clear that KU had many customers in Claiborne County, while TVA had customers in both Tazewell and New Tazewell on the critical date.

After an interesting review of the Congressional history of the 1959 TVA Act, Judge Taylor concluded:

"The TVA Board of Directors on August 26, 1964 made an official and formal finding to the effect that all of Claiborne County, including the towns of Tazewell and New Tazewell was within the periphery of the area for which TVA or its distributors were the primary source of power supply on July 1, 1957. At the time of the determination, the Directors had before them the four maps that were submitted to the Committees of Congress by the witnesses for TVA.

"The area within Claiborne County determined by the TVA Board to be within the area for which TVA or its distributors were the primary source of power supply in July 1, 1957 is indentical to the areas shown as served by the TVA distributors on the maps furnished by TVA to the Congressional Subcommittee.

"The finding of the Board was made in good faith and supported by substantial evidence.

"The history of the 1959 Act supports the finding of the TVA Board that Tazewell and New Tazewell were within the primary area served by TVA and its suppliers as of July 1,

1957. We do not believe that Congress in the 1959 Act intended to exclude the two Tazewells from the primary service area served by TVA and its suppliers as of July 1, 1957. U. S. v. Burleson [D.C.], 127 F.Supp. 400.

"None of the defendants has induced or conspired to induce any electric customer of KU to breach his or its contract with KU and none has been guilty of bad faith, fraud or deceit in the securing of electric power customers within the two municipalities.

"It results that the proof fails to show that plaintiff is entitled to any of the relief sought in the complaint."

The maps to which Judge Taylor refers are before this court. They were before Congress when it passed the disputed legislation. Tazewell and New Tazwell are clearly within both the Tennessee watershed and the perimeter of the TVA service area as it was outlined to Congress. In these cities on July 1, 1957, no private utility had any exclusive franchise, and in fact, TVA was then furnishing power to customers. In addition, the cities are located in a county where TVA clearly was the primary source of power on July 1, 1957. Under this set of facts, I do not see how we can properly interpret the 1959 TVA Act as making illegal a finding of fact by the Board of TVA that it was "the primary source of power" for "the area" concerned on July 1, 1957. The 1959 TVA Act and its relevant amendments seem to me to support TVA authority to make this finding. (73 Stat. 280 (1959), 16 U.S.C. § 831

sumers. In June, 1957 Powell Valley and LaFollette had combined kilowatt-hour sales of 1,025,793 as against 626,-043 kilowatt-hours for KU. In the same month, the combined Kilowatt demand for Powell Valley and LaFollette was 3,125 kilowatts as against 2,338 for KU. The depreciated plant investment in distribution facilities of Powell Valley and LaFollette (as of January 10, 1957 for Powell Valley and as of June 30, 1957 for La-Follette) was $902,999.17 as against KU investment on June 30, 1957 of $457,-947.93.

"On July 1, 1957, in Tazewell, KU supplied the electric energy requirements of 344 customers and Powell Valley supplied the requirements of 20 customers, and in New Tazewell KU supplied 217 customers and Powell Valley supplied 8 customers. Considering the two municipalities together, KU had a total of 561 customers and Powell Valley 28 customers. KU on such date served in these two municipalities 95.3% of the customers receiving electric service." (Quoted from Trial Judge's Memorandum Opinion, Appellant's Appendix at pp. 49a–50a.)

(1964). See in particular 16 U.S.C. § 831i and 16 U.S.C. § 831n-4). Judge Taylor so interpreted the Act and found "substantial evidence" to support the crucial finding.

I believe that Judge Taylor's interpretation and application of the statutory language represents both logical construction of the statutory language and compliance with Congressional intent.

I concur with my brothers' view that the 1959 TVA Act should be construed as giving KU standing to bring this suit, but I would affirm the District Judge's order dismissing same for the reasons given above and in his complete opinion.

Map of Claiborne County, Tennessee, showing customers and lines of distributors of TVA power as of July 1, 1957

Exhibit No. 91

EXHIBIT NO. 36

COOPERATIVES AND MUNICIPALITIES OPERATING
RURAL DISTRIBUTION LINES IN THIS AREA

36 APPALACHIAN ELECTRIC COOPERATIVE
81 KNOXVILLE ELECTRIC POWER AND WATER BOARD
57 LA FOLLETTE ELECTRIC DEPT.
114 POWELL VALLEY ELECTRIC COOPERATIVE

TENNESSEE VALLEY AUTHORITY
DEPARTMENT OF OPERATIONS
TRANSMISSION AND RURAL DISTRIBUTION LINES
IN CAMPBELL, CLAIBORNE, UNION AND GRAINGER
COUNTIES, TENNESSEE