## HARDIN, MAYOR OF TAZEWELL, ET AL. *v.* KENTUCKY UTILITIES CO.

No. 40.   Argued December 13, 1967.—Decided January 16, 1968.*

---

*Together with No. 50, *Powell Valley Electric Cooperative* v. *Kentucky Utilities Co.,* and No. 51, *Tennessee Valley Authority* v. *Kentucky Utilities Co.,* also on certiorari to the same court.

1

*William R. Stanifer* argued the cause for petitioners in Nos. 40 and 50. With him on the brief for petitioners in No. 40 was *Philip P. Ardery. Clyde Y. Cridlin* was on the brief for petitioner in No. 50. *Robert H. Marquis* argued the cause for petitioner in No. 51. With him on the brief were *Acting Solicitor General Spritzer, Richard A. Posner, Charles J. McCarthy* and *Thomas A. Pedersen.*

*Malcolm Y. Marshall* argued the cause for respondent in all three cases. With him on the brief were *Squire R. Ogden* and *James S. Welch.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The question for decision in these cases *is* whether Congress has prohibited the Tennessee Valley Authority from competing in the sale of electricity with respondent, the Kentucky Utilities Company, in two small villages in Claiborne County, Tennessee, and in a narrow corridor between the two villages and the Tennessee-Kentucky state boundary 16 miles away. By § 15d of the Tennessee Valley Authority Act of 1933, as added by the 1959 amendments to that Act, Congress barred the TVA from expanding its sales outside "the area for which the Corporation [TVA] or its distributors were the pri-

mary source of power supply on July 1, 1957," [1] and our problem is therefore the narrow one of deciding whether these villages and the narrow corridor are part of an "area" for which TVA was the primary source of power on the crucial date. The difficulty lies in determining the location and extent of the "area" to which the statute refers. In June 1957, TVA supplied 62% of the power used in all of Claiborne County, and therefore if the entire county is an "area" within the meaning of the statute, TVA would have been the "primary" source of power, and its expansion into the two villages would be

---

[1] Tennessee Valley Authority Act of 1933, § 15d (a), 73 Stat. 280, as amended, 73 Stat. 338, 16 U. S. C. § 831n–4 (a). The full text of the relevant portion of § 15d (a) is as follows:

"Unless otherwise specifically authorized by Act of Congress the Corporation shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a source of power supply outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area: *Provided, however,* That such additional area shall not in any event increase by more than 2½ per centum (or two thousand square miles, whichever is the lesser) the area for which the Corporation and its distributors were the primary source of power supply on July 1, 1957: *And provided further,* That no part of such additional area may be in a State not now served by the Corporation or its distributors or in a municipality receiving electric service from another source on or after July 1, 1957, and no more than five hundred square miles of such additional area may be in any one State now served by the Corporation or its distributors.

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act."

permissible. On the other hand, in the villages themselves, TVA supplied only 6% of the power in June 1957, while respondent supplied 94%; thus if the two villages either alone or with the corridor constitute an "area," TVA would not have been the primary source of power, and it would be barred by § 15d from expanding into that area.

The question of statutory interpretation now before us arose in this way. TVA is the major supplier of electric power in Tennessee and in many adjoining areas of Alabama, Mississippi, Georgia, Virginia, and Kentucky. Respondent, whose service area is centered in Kentucky, has long served customers in Tazewell and New Tazewell, the two villages within 16 miles of the Kentucky border in Claiborne County, Tennessee. The power lines of TVA distributors also crisscross Claiborne County, and TVA has therefore been able to serve a small number of customers in the two villages, even though respondent was the predominant source of power. Because Kentucky Utilities' retail rates for electricity in the two villages were approximately 2½ times higher for typical consumers than the rates for TVA power,[2] the value of residential and commercial properties served by TVA was substantially and uniformly higher than the value of similar properties served by respondent. This rate disparity created a seething discontent among residential and industrial consumers in the villages. Pointing out that they lived in the very heart of the TVA watershed and in immediate proximity to TVA's large Norris Lake, these citizens contended that it was wholly unjust and inequitable to deny them the benefits and advantages of cheap TVA power. After complaints, planning, and consultations over a period of more than three years, the local

---

[2] For the owner of an electrically heated home, TVA power might cost $30.50 for a winter month as against $75.53 for the identical amount of power supplied by respondent.

governments engaged a contractor to build the facilities necessary to establish a municipal system linked to TVA's cheap power. Kentucky Utilities' customers immediately began to discontinue their service and become customers of the municipal system.

Kentucky Utilities then filed this suit against TVA, the mayors of the two Tazewells, and the Powell Valley Electric Cooperative, a TVA distributor, charging them with conspiracy to destroy its Tazewell business and asking the court to enjoin TVA from supplying power to the new municipal system in alleged violation of § 15d. The District Court upheld the determination of the TVA Board of Directors that the two Tazewells were within TVA's primary service "area" and dismissed the case, 237 F. Supp. 502 (1964), but the Court of Appeals reversed, holding that the two villages plus the corridor constituted an "area" and that TVA accordingly was barred from extending its service in the Tazewells. 375 F. 2d 403 (1966). We granted certiorari, 386 U. S. 980 (1967), to resolve this important question in the administration of the TVA Act. We reverse and agree with the District Court that the TVA Board properly determined the relevant service "area" to extend beyond the two Tazewells and to include the entire county. TVA, as the primary power source within this area, could therefore properly make its low-cost power available to consumers in this entire county area including the two villages.

I.

Before discussing the merits, we shall briefly consider petitioners' contention that the Kentucky Utilities Company lacks standing to challenge the legality of TVA's activities. We agree with both the courts below that this contention is without merit. This Court has, it is true, repeatedly held that the economic injury which results from lawful competition cannot, in and of itself,

confer standing on the injured business to question the legality of any aspect of its competitor's operations. *Railroad Co.* v. *Ellerman,* 105 U. S. 166 (1882); *Alabama Power Co.* v. *Ickes,* 302 U. S. 464 (1938); *Tennessee Power Co.* v. *TVA,* 306 U. S. 118 (1939); *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113 (1940). But competitive injury provided no basis for standing in the above cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury. In contrast, it has been the rule, at least since the *Chicago Junction Case,* 264 U. S. 258 (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision. See *Alton R. Co.* v. *United States,* 315 U. S. 15, 19 (1942); *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, 83 (1958).

Petitioners concede, as of course they must, that one of the primary purposes of the area limitations in § 15d of the Act was to protect private utilities from TVA competition. This is evident from the provision itself and is amply supported by its legislative history. The provision grew out of TVA's efforts to find some way to meet the cost of new facilities without dependence upon annual appropriations from Congress. In 1955 TVA began to seek authority to issue bonds to finance these expenditures. Although TVA spokesmen assured Congress that the objective was not territorial expansion but only improvement of facilities in TVA's existing service area, many members of Congress were apprehensive and thought that if congressional budgetary control was to be weakened, some substitute to prevent territorial expansion should be found. A series of bills to give TVA borrowing power failed to pass.[3] Several

---

[3] S. 2373, 84th Cong., 1st Sess. (1955); H. R. 4266, 85th Cong., 1st Sess. (1957).

bills were then introduced combining the grant of borrowing power with various provisions to prohibit territorial expansion,[4] and one of these bills was eventually enacted as the TVA amendments of 1959. Although discussions of the territorial limitation mentioned a number of policy reasons for the restriction,[5] it is clear and undisputed that protection of private utilities from TVA competition was almost universally regarded as the primary objective of the limitation.[6] Since respondent is thus in the class which § 15d is designed to protect, it has standing under familiar judicial principles to bring this suit, see *Stark* v. *Wickard,* 321 U. S. 288, 309 (1944); cf. *United States* v. *ICC,* 337 U. S. 426, 433–434 (1949), and no explicit statutory provision is necessary to confer standing.[7]

---

[4] S. 1855, S. 1869, S. 1986, S. 2145, 85th Cong., 1st Sess. (1957); S. 931, H. R. 3460, 86th Cong., 1st Sess. (1959).

[5] One of the Senators active in framing the territorial limitation expressed concern over TVA's powerful bargaining position with respect to its purchase of coal. See S. Rep. No. 470, 86th Cong., 1st Sess., 54 (1959) (supplemental views of Senator Randolph).

[6] See, *e. g., id.,* at 9 (majority report); *id.,* at 54–55 (supplemental views of Senator Randolph); 105 Cong. Rec. 13053 (July 9, 1959) (remarks of Senator Cooper); *id.,* at 13054 (remarks of Senator Holland); *id.,* at 13055 (remarks of Senator Kerr); *id.,* at 13060–13061 (remarks of Senator Randolph); *id.,* at 13061 (remarks of Senator Byrd); hearings on H. R. 3460 before House Committee on Public Works, March 10–11, 1959, 86th Cong., 1st Sess., 110, 115 (testimony of Representative Vinson); *id.,* at 122 (testimony of Representative Boykin).

[7] Petitioners' reliance on *Kansas City Power & Light Co.* v. *McKay,* 96 U. S. App. D. C. 273, 225 F. 2d 924, cert. denied, 350 U. S. 884 (1955), is thus misplaced. The Court in *McKay* ruled that an explicit statutory provision was necessary to confer standing because of the "long established rule" that an injured competitor cannot sue to enforce statutory requirements not designed to protect competitors. In the case of statutes concerned with protecting competitive interests, the "long established rule" is of course precisely the opposite.

## II.

Basic to our consideration of the merits of these cases is an appraisal of the significance of the TVA Board's determination that all of Claiborne County, including the two Tazewells, constituted a single "area" in which TVA is the primary source of power. Petitioners argue that the Court of Appeals gave no weight whatever to this determination and urge that the finding should instead have been treated like an administrative interpretation by an agency or executive officer, to be set aside only if it is not properly related to the purposes of the statute. The opinion of the Court of Appeals is not altogether clear in dealing with this question, however,[8] and respondent has not attempted to argue here that the Court of Appeals could have decided the matter entirely on its own, without any consideration of the TVA Board's finding. Rather, respondent appears to agree with petitioners that the determination of the TVA Board is entitled to acceptance unless it lies outside the range of permissible choices contemplated by the statute, and we think this is the proper rule. The initial determination as to the extent of the "area" under § 15d must be made by the TVA Board in every case, since TVA is required under the Act to make power available to public bodies and cooperatives within the per-

---

[8] The Court of Appeals stated at one point:

"But, TVA argues, the 1959 Act must be read as committing to its Board of Directors authority to determine 'the area' in which it was the primary source of power on that date. We find no words in the Act which directly or impliedly delegated to TVA's Board such authority." 375 F. 2d, at 412.

Later in its opinion, however, the court suggests that this statement was not intended to deny any role to the Board's determination:

"We hold that the resolution of the TVA Board did not foreclose the testing of its validity by the District Judge or by this Court on this appeal." 375 F. 2d, at 415.

missible area.[9]  In making this determination as to the most appropriate boundaries for its service area, the TVA Board will normally evaluate the economic and engineering aspects of providing its service to the customers in question, especially in relation to the particular topography of the affected region.  Given the innate and inevitable vagueness of the "area" concept and the complexity of the factors relevant to decision in this matter, we think it is more efficient, and thus more in line with the overall purposes of the Act, for the courts to take the TVA's "area" determinations as their starting points and to set these determinations aside only when they lack reasonable support in relation to the statutory purpose of controlling, but not altogether prohibiting, territorial expansion.  Cf. *SEC* v. *New England Electric,* 384 U. S. 176, 185 (1966); *Bates & Guild Co.* v. *Payne,* 194 U. S. 106, 109–110 (1904).

### III.

Tested by this standard, we think the determination of the TVA Board with respect to Claiborne County should have been upheld by the court below.  Neither the language of § 15d, its legislative history, nor any of the economic and technical circumstances of this particular locality suggest that the TVA Board's determination here exceeded the outer boundaries of choice contemplated in the Act.

Certainly nothing in the language of § 15d (a) itself forecloses the TVA's present decision.  The second paragraph of that section reads:

> "Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally estab-

---

[9] See § 12 of the Tennessee Valley Authority Act, 48 Stat. 65, 16 U. S. C. § 831k.

lished electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act."

In light of this provision, respondent argues that even *within* its "area," TVA may not extend its services to new customers previously served by a private company. Literally, of course, this language does not establish such a rule. It simply states that when a customer is served by a private utility in this area of generally established service, an area perhaps broader than the "area" of primary service which is controlling under the first paragraph of § 15d (a), the Act *may* prevent TVA from supplying the customer; other parts of the subsection must be looked to for the actual prohibition. This literal reading, moreover, is the only appropriate one in light of other provisions of the statute. The first paragraph of § 15d (a) authorizes TVA to provide power not only within its "area" but also within an additional region "extending not more than five miles around the periphery of such area." This is followed by a proviso denying TVA the right to serve within this additional region any "municipality receiving electric service from another source on or after July 1, 1957." Since the Act makes the existence of a private supplier an explicit bar to TVA expansion only within the additional region, we cannot read the statute as also making the existence of a private supplier, in and of itself, an automatic bar to expansion in the primary service "area."

The parties have also called our attention to numerous incidents in the legislative history suggesting that Congress may have regarded the very villages involved in this case as either inside or outside of TVA's service area. Petitioners note that maps placed before the congressional committees showed the Tazewells as within TVA's primary service area. Respondent counters that one map submitted to the House Public Works Com-

mittee showed the Tazewells as within respondent's service area. In addition, respondent notes that a "gentlemen's agreement" between TVA and neighboring private utilities had placed the Tazewells within respondent's area, and respondent refers to a number of statements indicating that various sponsors of the territorial limitations intended to enact the "gentlemen's agreement" into law.

We do not find any of this information particularly helpful in resolving the question before us. The maps on which petitioners rely were large-scale representations of TVA's entire multistate system, and they were submitted to various committees for general reference. Even if all these maps had placed the Tazewells in the same area, it would be artificial in the extreme to assume that Congress actually entertained any specific intention with respect to these small villages in one tiny portion of the county, the State and the map. With respect to the "gentlemen's agreement," it is undeniable that many members of Congress did hope to freeze completely the existing situation by enactment of the territorial limitation. Others, the majority of the Senate Public Works Committee in particular, undoubtedly sought to include language that would authorize adjustments and permit a certain amount of elasticity in the availability of TVA service. We think it is sufficient to note, without tracing all the changes in the wording of the territorial limitation, that the language of the Act in its final form is a compromise and that the views of those who sought the most restrictive wording cannot control interpretation of the compromise version.

Finally, we think that apart from the structure of the Act and its legislative history, the facts of the situation in Claiborne County, in Tennessee, and in Kentucky support rather than undercut the TVA Board's determination. The parties place great stress on the question

whether respondent's service area should be characterized as a "peninsula" attached to its main region of service or as a mere "island" surrounded by TVA territory and therefore more properly subject to TVA intrusion. But we can attribute no controlling significance to such characterizations. The most isolated area of private service will necessarily be connected to the private company's main area by at least one power line such as the one present here, and the company may even, as here, serve scattered customers along the line—if indeed the region contains any customers to serve. At the same time a broad area served almost entirely by a private company and contiguous with its main service area may be crisscrossed by the lines of TVA distributors and TVA may even have scattered customers along these lines; the fact that the private company was thus surrounded by TVA might not under this statute justify TVA expansion into the "peninsula" or "island," whatever it may be, served by private power. In the present cases respondent did serve a substantial number of customers in the corridor between the Tazewells and its main service area in Kentucky, but if a "peninsula," it was at best a very narrow and tiny one in relation to the possible patterns of power distribution. TVA, on the other hand, served most of the rural areas in Claiborne County and had a substantial minority of the customers in the Tazewells themselves. Under these circumstances, the TVA Board could properly have concluded that the pattern of electric power distribution would be more sensible and efficient if TVA competed in the entire Tazewell municipal area as well as serving the relatively unprofitable rural customers, many of whom were rather close to respondent's transmission line into the Tazewells. In addition, the Board could have considered the existence of its significant, though not primary, service in the Tazewells themselves as a compelling reason for including these villages in its

"area," since the factors supporting inclusion were in any event significant and since the great disparity of rates in the villages had resulted in significant economic dislocations.

Under all these circumstances we cannot say that the conclusion of the TVA Board in the present cases is incompatible with the "area" concept formulated in the Act. We therefore reverse the judgment of the Court of Appeals and affirm that of the District Court.

*It is so ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, dissenting.

These cases present a narrow question of statutory construction, upon which differing views might reasonably be entertained. I cannot, however, agree that the position now adopted by the Court will satisfactorily achieve the purposes evidently sought by Congress in 1959. I therefore respectfully dissent.

The scope of judicial review of administrative action is, of course, governed principally by the terms and purposes of the underlying statutory system. Compare generally 4 Davis, Administrative Law Treatise § 30.03 (1958); Jaffe, Judicial Review: Question of Law, 69 Harv. L. Rev. 239; Jaffe, Judicial Control of Administrative Action 546 *et seq.* (1965). The purposes of these statutory provisions are uncommonly plain. The Court acknowledges, as it must, that "it is clear and undisputed that protection of private utilities from TVA competition was almost universally regarded as the primary objective of the [service area] limitation." *Ante,* at 7.

The provisions in question were expected to protect private utilities by "defin[ing]" and "limit[ing]" the

14

"working arrangement that now exists with respect to" the Authority's service area. S. Rep. No. 470, 86th Cong., 1st Sess., 8. They were thus intended to constrict the Authority's discretion as to the expansion of its area of service. It is no disparagement of the Authority to recognize that an orderly system of law does not place the enforcement of a restraint upon discretion into the unfettered hands of the party sought to be restrained; surely, therefore, the scope of judicial review of proceedings involving such limitations should be measured generously.

The role of the courts should, in particular, be viewed hospitably where, as here, the question sought to be reviewed does not significantly engage the agency's expertise. This is an instance "where the only or principal dispute relates to the meaning of the statutory term," *NLRB* v. *Marcus Trucking Co.*, 286 F. 2d 583, 591; it may, as Judge Friendly has noted, therefore appropriately be denominated a "question of law." *Ibid.* It presents issues on which courts, and not the Authority, are relatively more expert. See 4 Davis, *supra,* at § 30.04. No doubt "economic and engineering aspects," *ante,* at 9, including topography, may influence the Authority's wish to expand its area of service, but such factors can hardly prescribe the terms or stringency of Congress' prohibitions against expansion.

In light of these considerations, I am unable to accept this decision, the effect of which is to restrict severely the scope of judicial review of the Authority's determinations under § 15d(a). The Court forbids reviewing courts to set aside such determinations unless they lack "reasonable support," and then discovers such support here in the most minimal evidence.[1] At bottom, the support

---

[1] It should be noted that the agency determination upon which the Court places so much weight was reached at a "special meeting" of the Board of Directors on August 26, 1964, more than eight

adduced for this determination by the Court consists of two facts: first, the Authority's distributor served on July 1, 1957, eight customers in New Tazewell and 20 customers in Tazewell;[2] and second, at least some of the other residents of the two municipalities quite understandably would prefer to pay the lower rates for electrical power charged by the Authority.[3] If these facts illustrate the "reasonable support" demanded by the Court, Congress' stringent limitation upon the Authority has proved extraordinarily fragile.[4]

---

months after respondent filed its complaint, and only three weeks before trial. One of the staff memoranda upon which the determination was based refers specifically to this litigation. One might have supposed that a determination which was made *post litem motam* warranted at least cautious treatment.

[2] The Court's choice of descriptive phrase is noteworthy. The Court suggests that the Authority's distributor served "a substantial minority" of the customers in the two Tazewells. The District Court found, in fact, that on July 1, 1957, respondent served 95.3% of those customers. 237 F. Supp. 502, 513.

[3] The Court intimates darkly that "economic dislocations" have occurred. The pertinent evidence appears to consist at bottom of allegations that housing and other forms of economic development tend to locate in areas in which the Authority's less expensive electrical power is available. Surely the Court does not suppose that Congress in 1959 was unaware that the Authority's electrical power is relatively inexpensive, or that it did not recognize that those who reside outside the Authority's service area would find it economically desirable to have that area extended so as to include themselves.

[4] It is pertinent to note that neither of the two staff memoranda upon which the Authority's belated determination was explicitly based included among the "facts which appear to be relevant" (Memorandum from the Manager of Power to the General Manager, Tennessee Valley Authority, August 25, 1964, 2 Transcript of Record 801) any references to "economic and engineering aspects" (*ante,* at 9), or even to any "economic dislocations" (*ante,* at 13). Whatever the relevance of these factors in the eyes of the Court, the Authority's staff appears to have thought them immaterial. The determination itself does not, of course, refer to these factors.

Neither the statute nor the pertinent legislative history provides any formula for the precise measurement of the Authority's service area. However, given Congress' clear purpose to restrict stringently the expansion of the area served by the Authority on July 1, 1957, I think that the emphasis placed by the Court of Appeals on the number of customers served on that date by respondent and the Authority offers the basis of a sensible and practical standard. Certainly Congress did not wish or expect that, as this Court now holds, the question should be left largely, if not entirely, in the hands of the Authority. I would therefore affirm the judgment below for the reasons given in Judge O'Sullivan's opinion for the Court of Appeals, 375 F. 2d 403, supplemented by the considerations discussed in this opinion.