CORRUGATED CONTAINER CORP.

v.

COMMUNITY SERVICES ADMINIS-
TRATION and Bert A.
Gallegos, Director.

Civ. A. No. 75–0151.

United States District Court,
W. D. Virginia,
Roanoke Division.

Jan. 19, 1977.

Charles L. Williams, Jr., Gentry, Locke, Rakes & Moore, Roanoke, Va., for plaintiff.

Morgan E. Scott, Jr., Asst. U. S. Atty., Roanoke, Va., for defendants.

## OPINION

TURK, Chief Judge.

Plaintiff, Corrugated Container Corporation, a Virginia Corporation, engaged in the manufacture and distribution of Corrugated paper products, by this action challenges the authority of the Defendant, Community Services Administration, a Federal Agency, to provide federal funds for financing a for-profit business in direct competition with plaintiff. Specifically, plaintiff seeks to enjoin Defendant from any further disbursement of federal funds to American Packaging Corporation, a business venture which plaintiff contends was undertaken in direct violation of the intent of Congress as expressed in the Community Services Act of 1974, and asks that Defendant be required to recoup all federal funds used in this business venture. Jurisdiction of the court is alleged to be "Federal Question" jurisdiction pursuant to 28 U.S.C. § 1331, "Mandamus" jurisdiction pursuant to 28 U.S.C. § 1361 and "Administrative Procedure Act" jurisdiction pursuant to 5 U.S.C. § 702.

I

The following facts, none of which are in dispute, and most of which have been stipulated to by the parties, may be briefly stated:

The plaintiff, Corrugated Container Corporation (Corrugated), is a Virginia corporation engaged in the production of corrugated paper products. Its principal place of business is in the City of Roanoke, Virginia. The defendant, Community Services Administration (CSA), is an agency established within the executive branch of the United States government by the Community Services Act of 1974. The present Director of the CSA is Samuel Martinez. At the time of the institution of this proceeding, the Director was Bert A. Gallegos.

The Community Services Act of 1974 contains nine titles, or subchapters. Subchapter VII, entitled "Community Economic Development", is the section of the Act that is at issue in this case. This Subchapter is set forth at 42 U.S.C. § 2981 through § 2985. Part A of this Subchapter VII is the portion of the Act which is most directly applicable to the present situation.

Congress has stated that the purpose of Subchapter VII is:

" . . . to encourage the development of special programs by which the residents of urban and rural low-income areas may, through self-help and mobilization of the community at large, with appropriate Federal assistance, improve the quality of their economic and social participation in community life in such a way as to contribute to the elimination of poverty and the establishment of permanent economic and social benefits." 42 U.S.C. § 2981.

Congress further stated that its purpose in enacting Part A of Subchapter VII was to "establish special programs of assistance to non-profit private locally initiated community development corporations . . . ." 42 U.S.C. § 2982.

A community development corporation is defined as either:

" . . . a non-profit organization responsible to residents of the area it serves which is receiving financial assistance under Part A of this subchapter [VII], and any organization more than 50 per centum of which is owned by such an organization, or otherwise controlled by such an organization, or designated by such an organization for the purpose of this subchapter [VII]." 42 U.S.C. § 2981a.

Throughout the United States, many of these community development corporations receive financial assistance from the CSA in the form of grants. In turn, these community development corporations often provide financial assistance to other corporations and organizations which they foster and sponsor. This assistance is usually accomplished either in the form of loans, or by the purchase of capital stock in such corporations. In selective instances, CSA will award "venture autonomy" to original grant recipients who, in the past, have exhibited competence in administering and expending grant funds. Venture autonomy is officially awarded upon the execution of a written Venture Autonomy Agreement.

In the normal course of dealing between CSA and a community development corpo-

ration receiving financial aid directly from CSA, the corporation will file a funding proposal every two years, asking for a new grant award. That proposal is then reviewed and acted upon by CSA. If acted upon favorably, certain funds will be awarded to the corporation to be spent over the subsequent two years. These funds are then forwarded to the corporation to be deposited in a depository bank, and distributed in strict accord with a Three-Party Banking Agreement.

In the event that a community development corporation which has *not* been awarded venture autonomy wishes to invest grant funds in support of a venture, it is first necessary for that corporation to file extensive feasibility studies with CSA. After receiving these studies, CSA considers the proposal, and then notifies the corporation of its approval or disapproval of the proposed expenditure of grant funds. If the expenditure is approved, CSA then forwards its approval to both the community development corporation, and to the bank in which the funds have been deposited.

If a community development corporation *has* been awarded venture autonomy, then all that it is required to do before investing the grant funds in a venture is to file a feasibility study with CSA. This study must be filed at least twenty (20) days prior to the implementation of the venture. It is the practice of CSA to allow a community development corporation, which has venture autonomy, to invest grant funds completely at its discretion as long as it invests sums which are within the limits provided for in the Venture Autonomy Agreement. The only reason for requiring that a feasibility study be filed with CSA (by a community development corporation having venture autonomy) is to provide CSA with an opportunity to comment on a proposed venture.

The venture autonomy system used by CSA is based upon the recommendations of a Venture Autonomy Manual, prepared for the Center for Economic Development in Cambridge, Massachusetts, by the accounting firm of Peat, Marwick, Mitchell & Company of Washington, D. C. There is no

statute allowing or permitting the implementation of these venture autonomy agreements, nor is there any regulation properly adopting or approving the use of these agreements.

One community development corporation which currently receives financial assistance directly from CSA is the Southwest Virginia Community Development Fund (SVCDF). SVCDF is a non-profit corporation, organized in 1969 under the laws of the State of Virginia. During the first years of its existence, it received aid from the Office of Economic Opportunity (OEO). In 1975, when the CSA was created, SVCDF began to receive financial assistance from CSA as the successor of OEO. SVCDF receives approximately ninety percent (90%) of its funds from CSA. SVCDF obtains this funding in the same manner as do other community development corporations, that is, by filing funding proposals with CSA every two years. The funding period under which SVCDF is presently operating began in February, 1975, and will end in January, 1977. In SVCDF's funding proposal for this period, it requested a grant of approximately $4,000,000, and received approximately $3,000,000.

SVCDF is one of the community development corporations which has been awarded venture autonomy status by the CSA. The first Venture Autonomy Agreement between SVCDF and OEO became effective on June 3, 1974. The most recent such agreement, and the one presently in effect, was entered into on September 8, 1975, and gave SVCDF investment autonomy from September 8, 1975 through January 31, 1977. Through that agreement, SVCDF was granted autonomy to invest the following amounts in the following new investment categories:

| | |
|---|---|
| Manufacturing | $750,000.00 |
| Transporation | $300,000.00 |
| Wholesale Trade | $200,000.00 |
| Agricultural/Forestry/Fishing | $500,000.00 |
| Mining | $500,000.00 |
| Construction | $350,000.00 |
| Retail Trade | $200,000.00 |
| Services | $250,000.00 |
| Real Estate | $750,000.00 |

By the terms of paragraph III of the Venture Autonomy Agreement entered into on September 8, 1975, the investments of SVCDF were further limited as follows:

A. Complete venture feasibility studies must be sent to OED/CSA at least twenty (20) days prior to the use of grant funds. SVCDF will also provide information on each investment following the reporting requirements of the Quarterly Monitoring Report.

B. No use shall be made of grant venture funds which has not been approved by the Board of Directors of SVCDF.

C. SVCDF's Investment Capital (Budget Category 2.5) expenditures allowed under Venture Autonomy will comply with all grant conditions, except those parts of grant conditions requiring approval of Investment Capital expenditures. However, SVCDF must comply with all other parts of said conditions.

D. No investment of grant funds shall be made outside of the SIP target area of SVCDF under this agreement.

E. Consistent with its own prudent management and investment policies, SVCDF will attempt to leverage each Investment Capital expenditure as required by Grant Conditions.

F. When the SVCDF owns less than 100% of a venture, agreements must be entered into between the SVCDF and other parties and which protect SVCDF's interest to the maximum extent possible.

G. Investment Capital funds may not be used for investments which are not permitted under Title VII of the Community Services Act of 1974, as amended.

H. The degree of autonomy provided herein may be revoked or renegotiat-

ed in the event of one or more of the following events:

1. Thomas V. Morse, Jr., is no longer employed or otherwise retained in the capacity of Executive Director of SVCDF.

2. A materially adverse change occurs in the overall performance of SVCDF.

3. In the instance of SVCDF's refunding by CSA or its successor agency.

In the *Federal Register*, Bert A. Gallegos, as the Director of the CSA, established the rules and regulations applicable to all grants funded under Titles II, III (B), and VII of the Economic Opportunity Act of 1964, as amended, when these grants were to be administered by the CSA. These regulations also provided that the General Conditions for Titles II, III(B), and VII of the Economic Opportunity Act of 1964 were to remain in effect, substantially unchanged. An additional funding condition, which was issued at this time, provided that CSA program funds could only be expended in strict compliance with the Community Services Act of 1974, the General Conditions listed in the *Federal Register*, any Special Grant conditions, and any applicable CSA directives.

For approximately 18 months prior to August, 1975, the staff and the Board of Directors of SVCDF considered the idea of establishing a corrugated products production facility in the Roanoke Valley. Various studies were conducted by SVCDF and periodic reports were filed by SVCDF with CSA regarding the progress that was being made toward the establishment of a corrugated products production facility.

Finally, a written feasibility study for a corrugated box manufacturing project in Roanoke, Virginia, was prepared by SVCDF. It is dated August, 1974. SVCDF reported in this study that the risks involved in a corrugated box manufacturing venture were (1) shortages of material, (2) the availability of qualified personnel to implement the venture and (3) a sparse local market. The study reported that within a 100 mile radius of Roanoke potential demand exceeded productive supply capacity by $1.2 million per year. The report further stated that within this same area potential demand exceeded productive supply capacity by $12.8 million per year, and that present corrugated box suppliers were unable to satisfy the existing demand imbalance. It was the conclusion of those SVCDF staff members who prepared the feasibility study that shortages in corrugated sheet material, as well as capacity limitations, created a void in the marketplace. The same feasibility study projected that, after the start of a corrugated box venture, in the first year the sales level of the new venture would be $214,200.00; in the second year $674,400.00; in the third year, $949,300.00; and in the fourth year, $1,134,500.00. Those that prepared the feasibility study further reported that positive profits and positive cash flow were expected during the third year of operation. It was expected that the venture would require $950,000.00 for implementation, with a start-up expenditure exceeding $574,000.00. The persons submitting the feasibility study recommended that the Board of Directors of SVCDF approve the investment of $600,000.00 of venture capital in such a corrugated box manufacturing plant.

Subsequently, SVCDF submitted a document entitled "Market Conditions and Implications for the SVCDF Sheet Plant Venture." This document was dated June, 1975, and contained findings concerning the period since the preparation of the August, 1974, feasibility study. It was noted in the document that two indicators used to monitor market activity and expectations for the SVCDF sheet plant venture (the paper and allied products industry, and the motor freight industry) showed that business activity and employment in those industries were down considerably. The conclusion of SVCDF was that the area within a 150-mile radius of Roanoke had undergone a drastic change in market conditions since August, 1974. The study determined that what was

formerly a \$13.8 million per year excess of demand over aggregate supply of corrugated products had changed, and that there was now an \$8.1 million per year excess of aggregate supply over demand.

Actually, the excess demand reported in the initial feasibility study was primarily the result of a shortage of the raw materials used to produce corrugated products. This fact was recognized, and commented on, in the original feasibility study. SVCDF realized, and stated, in their report of June, 1975, that no excess of demand over aggregate supply existed at that time. No excess of demand over aggregate supply exists at the present time as well. Rather, the previously existing producers of corrugated products are operating at less than full capacity, and, together, are able to produce much greater quantities of corrugated products than are currently in demand.

The aforementioned feasibility study dated August, 1974, and the document identified as "Market Conditions and Implications for the SVCDF Sheet Plant Venture," and dated June, 1975, were submitted together by SVCDF to CSA in August, 1975, as a single feasibility study. It was forwarded to a business analyst on the CSA staff. SVCDF's purpose in submitting these documents was to conform to the provisions of their Venture Autonomy Agreement, which required that such a feasibility study be submitted to CSA at least twenty days prior to the use of grant funds.

At about this same time, the Board of Directors of SVCDF authorized the creation of a for-profit corporation to be known as the American Packaging Corporation (APC). A charter was issued to APC by Virginia's State Corporation Commission on July 23, 1975. APC was organized as a stock corporation with only one initial incorporator, SVCDF, and was authorized to issue 50,000 shares of stock at \$1.00 par value. APC was formed for the purpose of entering the corrugated box manufacturing industry, and it is currently involved in that activity. Its principal place of business is in the City of Roanoke, Virginia.

Jesus Martinez, a business analyst working for the CSA reviewed the feasibility study filed by SVCDF, and prepared a memorandum directed to Willie J. Williams, Chief, Programs Operation Division, Office of Economic Development, CSA. In this memorandum, Mr. Martinez reported that it was his opinion that SVCDF should not be allowed to invest in the proposed corrugated box manufacturing venture until they had supplied additional detailed information to CSA for review. The additional information which he felt should be requested included:

1. Detailed pro-forma statements (income statements, balance sheets, cash flow statements) based on the revised demand and sales projections.

2. Justification for investing now (if in fact adverse market conditions prevail) as opposed to waiting for a more favorable time for entry.

3. If the decision is to invest immediately, an explanation of the need for so much under-utilized physical capacity, since it appeared that over 50% of physical capacity would remain unused through the fourth year of operation.

4. A market capture strategy given a re-evaluation of the critical determinants for success in the industry.

After reviewing this memorandum, Mr. Williams sent a letter to Tom Morse, the Executive Director of the SVCDF. This letter communicated to Mr. Morse the conclusions of Mr. Martinez, and adopted these conclusions as the official conclusions of CSA in regard to proposed project. However, the letter also noted that under the Venture Autonomy Agreement, SVCDF would be permitted to proceed with the implementation of the corrugated box manufacturing venture regardless of the approval or disapproval of CSA.

Shortly after APC was incorporated, SVCDF began providing it with substantial support. In total, SVCDF provided approximately \$500,000. \$4,975 of this venture capital was used to purchase 100 percent of the issued capital stock of APC, all of which

was issued to SVCDF. An additional $495,-000 was made available to APC by SVCDF in the form of a loan evidenced by convertible subordinated debenture notes.

At the present time, APC is actively engaged in producing and marketing corrugated products, including corrugated boxes, partitions, and other inner-packing materials, as well as die-cut items. All of these products are being manufactured in Roanoke, and marketed primarily within a 100-mile radius of the City of Roanoke.

Corrugated Container Corporation is a corrugated products producer who, like APC, operates a sheet plant. A sheet plant is distinguished from a plant operating a corrugator in that a sheet plant purchases its corrugated board from other producers in a pre-manufactured condition. Corrugated Container Corporation manufactures and markets the same goods and products which are now being manufactured and marketed by APC and does so within the same geographical area as does APC. APC is soliciting orders for corrugated products from customers of Corrugated Container Corporation, which orders would be filled by Corrugated Container Corporation but for APC.

A market analysis was conducted to determine the status of the corrugated box industry within both metropolitan Roanoke and the area included within a 100-mile radius of the City of Roanoke. The report found that all end-users of corrugated goods within this area felt that the then existing suppliers (this excluded APC) would be able to meet their future needs without difficulty. In addition to the above report, statistics compiled by the American Fibre Box Association from its members indicated that the industry showed a substantial downward trend in 1975.

Currently, the corrugated box industry throughout the United States, and particularly in the Roanoke, Virginia, area is a highly competitive industry. Existing corrugated box producers and the producers of corrugated inner-packing material and die-cut pieces are actively soliciting business. None of the existing producers of corrugated products serving the area within 150 miles of Roanoke is operating at 100% of their production capacity. All are actively engaged in growth programs or in production stabilization programs.

By nature, the corrugated products business is geographically limited. The cost of shipping effectively limits a producer's market area to an outer limit of 250 miles of its production facility, but, more realistically, to within 150 miles of its production facility. Therefore, the future of both APC and Corrugated Container Corporation will necessarily depend upon consumers within that distance of Roanoke, Virginia.

## II

■ The case before the court is a civil action in which the plaintiff seeks injunctive relief. The suit clearly arises under the laws of the United States, specifically, certain sections of the Community Services Act of 1974. The plaintiff, Corrugated, has alleged in its pleadings that the amount of its loss exceeds $10,000 in lost profits, exclusive of interests and costs. Sufficient proof of the amount of loss which plaintiff has incurred, and will continue to incur in the future has been shown through stipulation, and in evidentiary hearings before this court, to justify a finding by the court that the plaintiff has suffered, or will suffer, the amount of damages required for this court's jurisdiction under 28 U.S.C. § 1331.

The evidence has shown that the corrugated box industry is very competitive among the 40 firms in the Roanoke area. It has also shown that Corrugated and APC are particularly competitive since they are the only two such firms located in the Roanoke Valley. It has been stipulated that the success of both Corrugated and APC depends upon the same customers in the same area. Corrugated has annual sales of over $1,000,000, and it is obvious that any substantial encroachment by APC into Corrugated's business would result in a loss of $10,000 in a very short time, if indeed, such a loss has not been sustained already.

■ As pointed out in plaintiff's brief, the difficulty incurred in trying to deter-

mine the precise amount of Corrugated's loss does not eliminate the court's jurisdiction under 28 U.S.C. § 1331. *Spock v. David,* 469 F.2d 1047, 1052 (3d Cir. 1972); *Scherr v. Volpe,* 336 F.Supp. 882, 885 (W.D. Wis.1971), aff'd. 466 F.2d 1027 (7th Cir. 1972); *Allway Taxi, Inc. v. City of New York,* 340 F.Supp. 1120 (S.D.N.Y.1972), *aff'd.* 468 F.2d 624 (2d Cir. 1972).

Further:

A finding of the amount in controversy can be based upon future or contingent damages, so long as there is a probability, not a possibility, of future harm. *Ammex Warehouse Co. v. Department of Alcoholic Beverage Control,* 224 F.Supp. 546, 551 (S.D.Cal.1963), *aff'd.* 378 U.S. 124, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964). When Corrugated's future losses are added to its losses to date, the jurisdictional amount requirement is easily met.

For the reasons stated, the court hereby finds that it has jurisdiction over this case under 28 U.S.C. § 1331, because the controversy arises under the laws of the United States, and involves over $10,000 in losses to the plaintiff.

Since the plaintiff, Corrugated, was not the subject of any direct regulation by the CSA, but was affected only indirectly by that agency's action, its standing to sue in this case has been challenged by the defendant, CSA. Corrugated, however, contends (and the court so finds) that it is entitled to a judicial review of the CSA's actions in this matter because plaintiff is a person adversely affected or aggrieved by agency action within the meaning of a relevant statute. As such, Corrugated is entitled to judicial review of this matter under 5 U.S.C. § 702, the Administrative Procedure Act.

In order for Corrugated to have standing to seek judicial review of CSA's administrative actions, it must show that it has suffered an injury in fact, and that its interest is arguably within the zone of interests intended to be protected by the relevant statute. *United States v. Students Challenging Regulatory Agency Proce-*

*dures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) hereinafter, (*SCRAP*); *Association of. Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (hereinafter, *Data Processing*). Further, it must be evident that the relevant statutes neither preclude judicial review, nor commit the action in question solely to the agency's discretion. 5 U.S.C. § 701(a).

It is clear to the court that the statutes in question, the Community Services Act, 42 U.S.C. §§ 2981–2985, in no way attempt to limit or preclude judicial review of the CSA's actions, nor do they commit those actions to the sole discretion of CSA. It is also evident to the Court that the Plaintiff, Corrugated, has an interest which is within the zone of interests intended to be protected by the relevant statute, and that Plaintiff has been injured in fact. Plaintiff in this case has alleged facts, which are undisputed by the defendant, and which indicate that it will suffer direct economic harm through the defendant's actions. The Supreme Court has held in several recent cases that economic injury is one of the clearest indicators of injury in fact which will bestow a plaintiff with standing to sue. *Data Processing, supra,* 397 U.S. at 152, 90 S.Ct. 827; *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). In fact, the Supreme Court has repeatedly held that a party may meet the "zone of interests" test by asserting and properly pleading a direct aesthetic, conservational, or recreational injury or interest, as well as the more obvious economic injury. *SCRAP, supra; Data Processing, supra.*

In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court held that the concept of standing was related solely to the questions of whether the case was justiciable, and whether the dispute sought to be adjudicated would be presented by a party with sufficient interest in the controversy to assure an adversary presentation. Certainly, a party with a financial interest of thousands of dollars

would be a party with sufficient interest to assure an adversary proceeding.

*Hardin v. Kentucky Utilities,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), is almost directly on point with respect to the case at hand. In *Hardin,* the Supreme Court pointed out that when a particular statutory provision reflects a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision. The court noted that the Act of Congress which established the Tennessee Valley Authority (TVA) was designed to protect private utility companies who were in competition with TVA from the unfair advantage which TVA had because of its government subsidy. This protection was accomplished by statutorily prohibiting the TVA from expanding its sales of electric power to any area in which it had not previously been the primary source of power supply. Therefore, the court found that when TVA began to invade an area in which Kentucky Utilities (KU) had previously been the primary source of power supply, KU became part of the class of interests which the TVA Act was designed to protect, and as such had standing to bring suit to enjoin TVA's sales of power which allegedly violated the restrictions of the statute. The court further found that no explicit statutory provision was necessary to confer standing in the circumstances of that case.

■ In the instant case, the statutory scheme of the Community Services Act also evinces an intent to provide protection from unfair competition to previously established businesses. Congress realized that the projects subsidized by the CSA would have an unfair competitive advantage over privately-owned businesses. For this reason, Congress enacted 42 U.S.C. § 2982b (hereinafter, § 2982b), which states in pertinent part as follows:

(a) The Director, under such regulations as he may establish, shall not provide financial assistance for any community economic development program under this part unless he determines that—

.    .    .    .    .

(5) the applicant is fulfilling or will fulfill a need for services, supplies, or facilities which is otherwise not being met;

.    .    .    .    .

(10) the program will not result in the displacement of employed workers or impair existing contracts for services, or result in the substitution of Federal or other funds in connection with work that would otherwise be performed;

§ 2982b(a)(5) and (10).

Corrugated has demonstrated to this court, and it has also been stipulated by the parties, that Corrugated will suffer direct economic loss as the result of CSA's actions due to the competition afforded by APC.

Therefore, Corrugated, as one of the businesses which is intended to be protected from unfair competition by the statute cited above is entitled to bring this action under the rule in *Hardin v. Kentucky Utilities, supra.*

The court is also of the opinion that it has mandamus jurisdiction in this case under 28 U.S.C. § 1361. This statute reads as follows:

The District Courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

■ Mandamus is appropriate where there is an express mandate in a statute which government officials do not obey, or where these officials are acting outside the zone of their permissible discretion and contrary to the law. *Miller v. Ackerman,* 488 F.2d 920, 921–2 (8th Cir. 1973); *McGaw v. Farrow,* 472 F.2d 952, 956–7 (4th Cir. 1973).

Further, it has been held that:

.    .    . even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated. *Davis Associates, Inc. v. Secretary, Dept.*

**152**

*of Hous. & U.D.*, 498 F.2d 385, 389 n. 5 (1st Cir. 1974).

██ As previously noted, there was an obvious Congressional intent (evidenced by § 2982b(a)(5) & (10) as set out above) to protect Corrugated, and others similarly situated, from unfair competition from CSA-sponsored projects. The language of this statute creates a positive duty on the part of CSA to see that this Congressional intent is carried out. Although CSA was intended to have a great deal of discretion in the distribution of their allotted funds, Congress did put certain very strict limitations on the manner in which those funds could be distributed. The language of § 2982b is very specific, and places an absolute duty on CSA to abide by its requirements. Since the plaintiff, Corrugated, has alleged that the Director of CSA has exceeded his statutory authority and ignored these statutory mandates, this court certainly has mandamus jurisdiction in this case.

### III

██ Having asserted the plaintiff's standing to bring this suit, as well as its own jurisdiction in the matter, the Court must now consider the merits of the plaintiff's complaint. The thrust of Corrugated's allegations is that the CSA, through Director Gallegos, abused its discretion under the statutes in question in that they illegally delegated to SVCDF their statutory duty to maintain control over CSA funds. It is alleged that CSA has allowed SVCDF to become a virtually autonomous organization (with only the refunding controls remaining), instead of exercising that control over CSA funds, which is demanded by the plain language of the Community Services Act. It is further alleged that this autonomy allowed SVCDF to create APC, in direct violation of the terms of that Act and against the intent of Congress. More specifically, it is alleged that CSA allowed SVCDF to establish APC without regard to, and in direct violation of, 42 U.S.C. § 2981, and § 2982b(a)(3), (4), (5) and (10).

§ 2981 sets out the general purposes of Subchapter VII, those being:

". . . to encourage the development of special programs by which the residents of urban and rural low-income areas may, through self-help and mobilization of the community at large, with appropriate Federal assistance, improve the quality of their economic and social participation in community life in such a way as to contribute to the elimination of poverty and the establishment of permanent economic and social benefits."

Corrugated contends that these general purposes have been frustrated by the CSA's actions in this matter, since these purposes cannot be furthered by ventures such as APC, which produce products for a saturated and depressed market.

§ 2982b(a)(3), (4), (5) and (10) state as follows:

The Director, under such regulations as he may establish, shall not provide financial assistance for any community economic development program under this part unless he determines that—

.   .   .   .   .

(3) adequate technical assistance is made available and committed to the programs being supported;
(4) such financial assistance will materially further the purposes of this part;
(5) the applicant is fulfilling or will fulfill a need for services, supplies, or facilities which is otherwise not being met;

.   .   .   .   .

A clearer, or more complete, violation of the statutory mandates of § 2982b is beyond the imagination of the Court.

Both the plaintiff and the defendant, in their pleadings, briefs, and arguments, have experienced considerable difficulty applying the relevant statutes (particularly § 2982b) to the facts of this case. The terminology of the statutes simply does not fit the facts of the situation. The court is of the opinion that the reason for all of this confusion was that the roles of the parties were changed by the execution of the VAA. CSA, whose duty of regulation is outlined by § 2982b, delegated all of its authority to SVCDF, and became a virtually helpless bystander.

This left SVCDF with the power to regulate itself and its progeny, such as APC. This situation was neither foreseen, nor intended, by Congress when it enacted § 2982b. Therefore, it is not surprising that the language of the statute is not readily adaptable to the facts of this case. Therefore, the court's opinion will concentrate on what the court considers to have been the crucial event of the case—the execution of the VAA between CSA and SVCDF. It was at this point that the defendant defaulted on its obligations under § 2982b, and therefore failed to fulfill its duties under that statute towards the plaintiff, and others similarly situated.

That Congress neither foresaw, nor intended, the implementation of this VAA is readily ascertainable from the fact that § 2982b was enacted at all. Congress obviously intended for the CSA to exercise the controls mandated by § 2982b. Any theory that Congress passively approved of these agreements is demolished by a common sense interpretation of the plain language of § 2982b. From a reading of this statute, it is clear that Congress never intended such a relinquishment of control by CSA to occur.

It has been stipulated by both parties that there is no statute which permits, or allows for, the implementation of this Venture Autonomy Agreement, nor is there any regulation which properly adopts, or approves, its use. Therefore, the court is of the opinion that it should never have been entered into, and that its implementation resulted in a breach of the duty owed by CSA to strictly enforce the restrictions placed upon its funding by § 2982b. If CSA had maintained that degree of control over its funds which is mandated by § 2982b, it seems certain that the APC venture would never have been implemented, particularly in view of the negative recommendation of the CSA's business analyst, Jesus Martinez.

There is no evidence in the record that CSA made any effort to fulfill its obligations under § 2982b, but rather sidestepped these obligations completely through the use of the VAA. Further, if any control was retained by CSA under the VAA, there is no indication in the record that it was exercised in a manner which would fulfill the requirements of § 2982b.

## IV

In enacting Subchapter VII of the Community Services Act of 1974, Congress sought to encourage the development of cooperative business projects by low-income persons. 42 U.S.C. § 2981. As a corollary of this purpose, Congress imposed restrictions upon the use of grant monies awarded under the Act to prevent competition with existing businesses. 42 U.S.C. § 2982b. The anti-competitive restrictions of § 2982b were erected to avoid an obvious danger—that grant money designed to promote economic self-help would be diverted to instigate government sponsored competition with existing enterprises, thus jeopardizing the self-sufficiency of the gainfully employed. Ironically, by acquiescing in the funding of APC, CSA has achieved just this untoward result. Corrugated and its employees, it has been stipulated, will suffer direct economic loss as a consequence of APC's subsized entry into the highly competitive and declining market for paper packing products. CSA has subverted the Act's beneficial purpose, the promotion of cooperative self-sufficiency in low income areas, and avoided the Act's anti-competitive commands, by allowing the funding of APC. CSA has thus inflicted irreparable injury upon Corrugated and its employees, an injury for which there is no adequate legal remedy.[1] The court must accordingly address the complex task of fashioning relief to eliminate this plain subversion of the Act.

---

1. The pre-requisites for equitable relief are present here, and require no extended discussion. No legal remedy known to this court can compensate for or prevent the impact of government subsidized competition upon Corrugated. Its losses, and the effect thereof upon its employees, while real, are not precisely measurable. Moreover, the most effective remedy is prevention of future competition subsidized by CSA rather than compensation for past injuries.

■ In tailoring its remedy, the Court must consider the interests of SVCDF and APC, although they are not parties to this action, as well as the varying needs of CSA and Corrugated. CSA has already poured taxpayer funds into APC, and an overly abrupt or categorical liquidation of APC as an entity might well force the premature sale of APC's assets at a substantial loss. The needs of APC's employees must also be considered. SVCDF appears to have no interests separable from those of the CSA and APC which might be affected by any relief granted here, because SVCDF has acted solely as a medium for funneling CSA funds to APC. Any remedy abrogating SVCDF's venture autonomy status would by definition impinge on its autonomy as a distributor of CSA monies. However, this unfettered autonomy cannot be reconciled with the purposes of the Act, and is therefore entitled to scant protection. SVCDF's stockholder interest in APC is adequately preserved by this Court's accommodation of APC and is, at bottom, indistinguishable from CSA's interests in APC and its assets. See, 45 C.F.R. § 1067.5–3, Appendix B, § 13. CSA, in turn, should not suffer undue interference with its legitimate statutory programs, or disproportionate disruption of its contractual relations with SVCDF or APC.

At a minimum, CSA must be required to adhere to the anti-competitive injunction of § 2982b, and to cease its support of APC's operations as a manufacturer of corrugated paper packing products. Fortunately, this result can be achieved prospectively by directing CSA to use for this purpose the funding mechanisms it has developed by regulation and has set forth in the venture autonomy agreement currently in force with SVCDF. As mentioned, that agreement departs from the statutory scheme because it contains no substantive provisions providing for enforcement of the anti-competition restrictions of § 2982b. The VAA has been in effect for some time, however, and much of the challenged conduct has matured beyond the preventive powers of the Court. Yet, without reforming the substantive aspects of the existing VAA, the Court can and will prevent future violations of § 2982b by directing CSA to enforce the funding controls it retains.

The current VAA expires by its own terms on January 31, 1977, and CSA may revoke or renegotiate venture autonomy "in the instance of SVCDF's refunding by CSA or its successor agency." Moreover, CSA rules and regulations provide that no expenses may be charged against program funds which are incurred after the grant termination date, in this case, January 31, 1977. 45 C.F.R. § 1067.5–3, Appendix A, § 3. § 3 further places unexpended grant funds under CSA control at the termination of the grant. These funding controls apply to and are incorporated within the VAA. Accordingly, the Court will direct that CSA not enter into any further agreements with SVCDF at the expiration of the current VAA which would accord that agency the discretion to award grants to competitors of existing paper packaging producers within SCVDF's impact area. Thus, any future agreements will be subject to the restrictions embodied in §§ 2982b(a)(5) and (10). CSA funds that were not expended by either SVCDF or APC during the life of the current grant will by operation of the funding controls revert to CSA. None of the funds in this category may be used to support competition with enterprises such as Corrugated. Within these remedial contours, CSA retains the discretion to shape its relations with SCVDF, provided only that § 2982 is not violated and competition with Corrugated and similarly situated businesses is not subsidized. SVCDF can continue to function as a disbursing agency consistent with those statutory limitations and the finding that the funding of APC conflicts with the Act. Finally, APC attains some flexibility to study and pursue whatever options it may have for continued operation in a different field, or for the most advantageous sale of its assets and the placing of its employees.

As fashioned, the Court's remedy is directed solely at CSA, and is wholly prospective in effect. No existing agreements are infringed. Because the remedy is so limited, and is framed to reshape CSA's un-

doubted discretion in channeling funds under the Act so that conformity with the narrow restrictions of § 2982b is achieved, the Court is constrained to deny issuance of a mandatory injunction under 28 U.S.C. 1361. In order to accommodate APC and its employees, and because it cannot undo what has been done, the Court must also reject petitioner's request that those CSA monies already expended to support APC be recouped.

This opinion shall constitute the Court's findings of fact and conclusions of law, and an order in accordance herewith shall be entered this day.