**PUBLIC CITIZEN et al., Plaintiffs,**

v.

**Carol Tucker FOREMAN et al., Defendants,**

**American Meat Institute et al., Intervening Defendants.**

**Civ. A. No. 78–1064.**

United States District Court, District of Columbia.

Feb. 5, 1979.

As Modified Feb. 14, 1979.

William B. Schultz, Alan B. Morrison, Washington, D. C., for plaintiffs; Ronald Plesser, Washington, D. C., of counsel.

Arthur E. Korkosz, Washington, D. C., for Federal defendants.

Alan H. Kaplan, Richard S. Morey, Glenn E. Davis, Washington, D. C., for intervening defendant American Meat Institute.

Edwin H. Pewett, Hershel Shanks, James Bruce Davis, Washington, D. C., for intervening defendant Independent Meat Packers Assn.

## MEMORANDUM OPINION

GESELL, District Judge.

Plaintiffs seek to ban the use of nitrite in bacon. They contend that the United States Department of Agriculture ("USDA") no longer has authority to issue regulations permitting or requiring such use and ask the Court to declare that the Food and Drug Administration ("FDA"), by reason of its statutory authority over food and color additives, has sole authority to regulate the use of nitrite in bacon. Basic questions of standing, statutory construction and primary jurisdiction are presented. The case is before the Court on cross-motions for summary judgment which have been fully briefed and argued.

## I.

The USDA has permitted producers to add nitrite to bacon under controlled conditions for more than 50 years. Regulations issued in 1925 allowed only the use of sodium nitrite, in quantities up to 200 parts per million ("ppm"), but in 1941 potassium nitrite was afforded the same treatment. 6 Fed.Reg. 1144 (Feb. 26, 1941). The USDA further amended its meat additive regulations in 1945, but did not alter the rule permitting the addition of sodium nitrite and potassium nitrite to meats in quantities up to 200 ppm. 10 Fed.Reg. 3339 (March 29, 1945). This rule remained in effect until 1964, when new regulations were once again promulgated. No substantive change was then effected with respect to the permissible level of nitrite in meat; but, for the first time, the USDA specified in its regulations the "purpose" for which nitrite could be added to meat products. Only one purpose was so cited: "To fix color." According to the new regulations, this meant that the substance was "acceptable for use in the processing of products, provided [it is] used for the purpose[s] indicated . . ." 29 Fed.Reg. 12580–81 (Sept. 4, 1964); see 9 C.F.R. § 318.7(c)(4) (1978).

In the early 1970's scientific investigation suggested that nitrite may combine with secondary and tertiary amines (organic chemicals that sometimes exist naturally in meats) to form nitrosamines, a concededly carcinogenic substance. Moreover, it was discovered that nitrosamines often appear with greater frequency in cooked bacon than in other varieties of cooked meat since bacon is typically fried at high temperatures. In the meantime, scientists discovered that nitrite also plays a role in inhibiting the growth of Clostridium botulinum, a bacterium that can produce botulism. It appears that no other substance has yet been discovered which has the same desirable effect.

Because this new information raised substantial questions about the use of nitrite in meat, the USDA established in 1973 an Expert Panel on Nitrites, Nitrates and Nitrosamines to review all aspects of the subject. After this panel issued various recommendations, the USDA published in 1975 a Notice of Proposed Rule-Making with respect to the addition of nitrite to bacon, inviting public comment. 40 Fed.Reg. 52614–16 (Nov. 11, 1975). Many comments were submitted, including some from the plaintiff organization. Finally, on May 16, 1978, the USDA promulgated new regulations governing the use of nitrite in bacon. 43 Fed.Reg. 20992–95. "[In] order to assure the prevention of toxin formation by *Clos-*

*tridium botulinum,"* *id.* at 20994, sodium nitrite at 120 ppm or potassium nitrite at 148 ppm was *required* to be added to all bacon. "[In] order to prevent the formation of nitrosamines in bacon cured with nitrites," *id.* at 20995, the USDA further ruled that 550 ppm of sodium ascorbate or sodium crythorbate had to be added to all bacon treated with nitrite.

## II.

The Court must first address the question of standing. Plaintiffs are a public-interest organization and two individuals. The complaint alleges that Public Citizen has supporters and members of its staff who now are, and in the future will continue to be, consumers of bacon, and further is a group that filed comments with the USDA in connection with the promulgation of the May 1978 regulations. As to plaintiff Silverman, the complaint alleges that she currently consumes bacon, but would prefer to purchase nitrite-free bacon were it available at a reasonable price. It is alleged as to plaintiff Wolfe that he refuses and will continue to refuse to eat any but nitrite-free bacon available at a reasonable price.

The theory of plaintiffs' action is that the USDA lacked power to issue the May 1978 regulations because two amendments to the Food, Drug and Cosmetic Act of 1938, 21 U.S.C. §§ 301–392 (the "FDA Act"), have placed complete and sole responsibility for nitrite regulation in the FDA: The Food Additive Amendments of 1958, Pub.L. 85–929, 72 Stat. 1785, and the Color Additive Amendments of 1960, Pub.L. 86–618, 74 Stat. 399.

■ At the outset it appears that Public Citizen has not even met the rudimentary standing requirements of *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 341–45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977),[1] or *Sierra Club v. Morton,* 405 U.S. 727, 735, 738–40, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Public Citizen is not alleged to have any members or the like significantly and adversely affected by the USDA's action and it surely is not enough that its supporters and staff members eat bacon. The Court will, however, assume, for the purposes of this opinion, that Public Citizen represents individuals who fit within either of the two categories typified by the two individual plaintiffs.

■ The rules of standing have two sources. One is found in Article III of the United States Constitution, which permits the federal courts to hear only "cases or controversies." A necessary component of this requirement is that the particular agency action in controversy have actually and in fact injured the plaintiffs. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The second source is found in a set of judicially-created "prudential considerations." *See id.,* 422 U.S. at 499–500, 95 S.Ct. 2197. One such consideration, recently reaffirmed by the Supreme Court, is that a plaintiff must assert "his own legal rights and interests rather than [base] his claim for relief upon the rights of third parties." *Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978).[2] Both of these rules apply to bar standing in this case.

■ There can be little doubt that plaintiffs would have standing to challenge the substance of the USDA's May 1978 regulation. Such, however, is not this case. Plaintiffs argue solely that jurisdiction over the use of nitrites in bacon properly resides in the FDA rather than in the USDA. Plaintiffs are thus arguing on behalf of the interests of the FDA, a third party which the plaintiffs have in fact named here as a defendant. The rules of standing do not permit the vicarious assertion of rights and no one of the various restricted exceptions to this prudential rule applies here. *See NAACP v. Alabama,* 357 U.S. 449, 458–60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Eisen-*

---

1. The Court notes that the issue of whether Public Citizen qualifies as a membership organization under *Hunt, supra,* was neither briefed nor argued, and it does not decide that issue here.

2. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 78, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (in this way, a court can avoid the adjudication of rights which the third party "may not wish to assert").

*stadt v. Baird*, 405 U.S. 438, 443–46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Broadrick v. Oklahoma,* 413 U.S. 601, 611–16, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

More importantly, plaintiffs cannot be said to have been actually injured by the assumption of jurisdiction over the use of nitrite in bacon by the USDA rather than by the FDA. It is not enough that plaintiffs can claim that the USDA's action constituted an injury to their interest in the proper functioning of government. Such an injury is shared by the entire populace as citizens or as voters, and is not sufficient to confer standing. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216–21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Plaintiffs, though, do go further and contend that they are injured because the USDA's May 1978 regulation prevents them from purchasing nitrite-free bacon. The answer to this is that it is entirely too speculative to say that the relief plaintiffs request—a transfer of jurisdiction to the FDA—can or will remedy their alleged injury. As stated by the Supreme Court, a plaintiff must show "an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). *See Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. 2197; *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536

(1973).[3] Here, too many uncontrollable and uncertain factors may intervene between a judgment favorable to plaintiffs and any redressment of the injury they claim to be suffering. The Court need suggest only the most obvious: the legal uncertainty of whether the Delaney clause of the FDA Act, *see* 21 U.S.C. §§ 348(c)(3)(A) & 376(b)(5)(B), might apply to the issue at hand, the unpredictable character of the FDA's action as to the use of nitrite in bacon, and the possibility that the USDA would bar nitrite-free bacon from interstate commerce as an "adulterated" substance whatever the FDA might do.

### III.

Since the law of standing remains unsettled, however, the Court will not rest its decision on plaintiffs' lack of standing. The defendants did not challenge standing until the Court raised the question *sua sponte* and there has been a full development of the issues on the merits. In addition, the Court has decided that it must deny plaintiffs' motion for summary judgment on the merits. Accordingly, the Court will now turn to those merits.

The basic question presented to the Court is whether and to what extent anything in either the Food Additive Amendments of 1958 or the Color Additive Amendments of 1960 deprived the USDA of its authority[4]

---

3. *See also Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* 438 U.S. at 71–78 & n. 20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (plaintiff must make a showing of "substantial likelihood" of alleviation).

4. If no contrary provision exists in the FDA Act, the USDA indisputably had the authority to promulgate the May 1978 regulations in question here. 21 U.S.C. § 621 vests the Secretary of Agriculture with the authority to "make such rules and regulations as are necessary for the efficient execution of [the Meat Inspection Act, 21 U.S.C. §§ 601–24]." The Secretary is obliged under 21 U.S.C. §§ 621, 603 & 605, to inspect all meats and meat food products, including meat coming from swine, to determine whether or not the items are "adulterated." Meat containing unsafe levels of nitrite or clostridium botulinum could certainly be deemed "adulterated," for an "adulterated" meat prod-

uct, under the Meat Inspection Act, includes any one of the following:

— The product "contains any poisonous or deleterious substance which"
  – in the case of an added substance "may render it injurious to health";
  – in the case of other substances, would "ordinarily render it injurious to health."

— The product "bears or contains . . . any added poisonous or added deleterious substance . . . which may, in the judgment of the Secretary, make such article unfit for human food."

— The meat "bears or contains any food additive which is unsafe within the meaning" of 21 U.S.C. § 348.

— The meat "bears or contains any color additive which is unsafe within the meaning" of 21 U.S.C. § 376.

— "Use" of a food additive or color additive in meat is "prohibited by regulations of the

to issue regulations of the sort promulgated in May 1978.

A. *Food Additive Amendments of 1958*

■ The FDA has the authority, under 21 U.S.C. § 348, to regulate "food additives." The term, "food additive," is critical to this action and is defined in 21 U.S.C. § 321(s) as "any substance the intended use of which results or may reasonably be expected to result . . . in its becoming a component . . . of any food . . . [and is not "generally recognized as safe," as is the case with nitrite]." Exempted from this definition are two classes of substances of importance here. The first is any color additive. 21 U.S.C. § 321(s)(3). The second is "any substance used in accordance with a sanction or approval granted prior to September 6, 1958, pursuant to . . . the Meat Inspection Act of March 4, 1907, as amended and extended . . . ." 21 U.S.C. § 321(s)(4). The USDA argues that this second exemption (the "prior sanction clause") has always ensured that nitrite does not fall into the FDA's food additive jurisdiction and permitted the USDA to promulgate its May 1978 regulation. Plaintiffs counter that the prior-sanction clause did not authorize promulgation of the new USDA regulation, because the clause does not immunize new USDA regulations governing the addition of a substance to meat if their fundamental nature or purpose departs from what was the case as of September 1958. Plaintiffs first point out that the May 1978 regulation *requires* the use of nitrite in bacon at a level of 120 ppm, while the 1945 nitrite regulation—the rule in effect as of September 1958—simply *permitted* the use of nitrite up to 200 ppm. Second, plaintiffs urge that, while the purpose of the May 1978 rule was expressly stated to be the prevention of botulism, the purpose of the 1945 regulation was simply to fix or impart color to the treated meat and not at all to inhibit botulism.

As a practical matter, plaintiffs' challenge is directed at an understanding which has been reached on this issue between the USDA and the FDA. On January 24, 1978, the USDA sent a letter to the FDA explaining why it believed that the prior-sanction clause still applied to its regulation of nitrite. That letter, accompanied by exhibits, detailed the reasons why the USDA's pre-1958 regulations had considered nitrite to be a "preservative,"[5] as well as a coloring agent. The FDA has concurred in this letter's reasoning and conclusion, as is evidenced by Sherwin Gardner's affidavit of September 29, 1978.

Viewed in this light, the Court has little trouble affirming the agencies' action. For, even assuming *arguendo* that the creation of a new purpose would deprive the USDA's May 1978 regulation of prior-sanctioned status,[6] plaintiffs have been unable

Secretary in establishments at which inspection is maintained . . . ."
— The meat item is for "any . . . reason unsound, unhealthful, unwholesome, or otherwise unfit for human food."
— The meat article "has been prepared . . whereby it may . . . have been rendered injurious to health."
21 U.S.C. § 601(m).

5. The Court accepts the agencies' position that the antibotulism effect of nitrite is "preservative." "[P]reservation consists of the prevention of microbial decomposition." *Hearings on Regulation of Food Additives and Medicated Animal Feeds before the Intergovernmental Relations Subcomm. of the H. Comm. on Government Operations,* 92d Cong., 1st Sess. 268 (March 16, 17, 18, 29 & 30, 1971) (statement of Dr. Byerly of USDA). The Court also believes that the plaintiffs' change-in-purpose argument, if valid, should not be permitted to encompass anything less than broad and fundamental changes in purpose, *i. e.,* more of a change would be needed to vitiate the prior-sanctioned status of a regulation than simply additions or subtractions from a list of bacteria to be counteracted by the regulated substance.

6. The Court will therefore not decide whether or not any significance should be given to a change in purpose behind a regulation otherwise comprehended within the prior-sanction clause. Plaintiffs rest their argument in this regard almost exclusively on certain comments made by FDA General Counsel Goodrich in 1971 before a House Subcommittee investigating the use of nitrite in meat (and made long after enactment of the Food Additive Amendments):

In terms of the prior sanction, of course, it would have to be for the same conditions that the product had the approval in 1958 . . . . .

to show that the agencies' joint position here to the effect that no basic change in purpose was effected in the USDA's nitrite regulations is erroneous as a matter of law or, in its factual aspects, suffers from arbitrariness or irrationality.

To be sure, the USDA's method of regulating the use of nitrite in bacon has changed from establishing a ceiling to mandating the injection of a specified amount in all commercial bacon. Yet, this change did not relax the levels, the conditions, or the purposes of nitrite use arguably in the direction of increasing the risks to health. In the absence of such a change, the Court is unwilling to find that Congress intended that the prior-sanction clause lose its applicability.

The Court further upholds the agencies' joint determination that the USDA had preservation partly in mind in its pre-1958 regulation of nitrite.[7] This administrative determination substantially rested on findings of fact; moreover, it must not be subject to *de novo* judicial review in light of the complexities presented, the agencies' expertise, the respect owed coordinate branches of government, and the need for the efficient operation of government. *See Hardin v. Kentucky Utilities Co.,* 390 U.S. 1,

88 S.Ct. 651, 19 L.Ed.2d 787 (1968). Judicial deference is also due since the Court is faced with an agency's affirmation of what its own purposes were at various points in the past. In sum, the agencies' decision in this regard will not be overturned unless it clearly wants in rationality or support.

To begin with, the Court accepts the Government's explanation for why no statement of preservative purpose was included in the USDA's pre-1958 nitrite regulations: that the preservative benefits flowing from the use of nitrite in meat were so evident prior to 1958 that the USDA saw no reason to state those benefits in the corpus of its regulations. The Court further accepts the agencies' conclusion that the preservative qualities of nitrite were common knowledge before 1958. Two textbooks written prior to 1958 by then officials of the USDA mention either the "preservation" or the antibacterial properties of nitrite in meats. *J. Mohler & A. Eichhorn, Text-Book of Meat Hygiene* 101 (1943 ed.); *A. Miller, Meat Hygiene* 295–96 (1951). *See also* 10 Fed. Reg. 3346 (March 29, 1945). Finally, plaintiffs have supplied the Court with no concrete evidence that the USDA did not actually have this common knowledge in mind when it promulgated its various pre-1958

---

If there were to be some *change* in the conditions of use, levels, *or purpose*, then, of course, it would have to come under the food additive law.

*Hearings on Regulation of Food Additives and Medicated Animal Feeds before the Intergovernmental Relations Subcomm. of the H. Comm. on Government Operations,* 92d Cong., 1st Sess. 264 (March 16, 17, 18, 29 & 30, 1971) (emphasis supplied). Several considerations cast doubt on the accuracy of this statement. The prior-sanction clause itself speaks of "any substance *used* in accordance with a sanction or approval" as of September 1958 (emphasis supplied). The term "use" need not ineluctably include the concept of purpose or effect, as a comparison between 21 U.S.C. § 348(b)(2)(B) and *id.* § 348(b)(2)(C) and an examination of the language of 21 U.S.C. § 348(c)(4)(B) demonstrates. Moreover, by regulation, the FDA has stated the conditions under which a prior sanction may be found to exist:

A prior sanction shall exist only for a specific use(s) of a substance in food, i. e., the *level* (s), *condition* (s), *product* (s), etc., for which there was explicit approval by . . . the

United States Department of Agriculture prior to September 6, 1958.

21 C.F.R. § 181.5(a) (emphasis supplied).

Finally, an arguably defensible interpretation of the prior-sanction clause would be that it was meant solely to lose its applicability when an otherwise covered regulatory scheme turns away from the purpose of protecting safety and health. Otherwise, the clause might become a subtle deterrent to the consideration by USDA of new scientific developments in the health and safety area. Certainly, taking a new risk to health—namely, botulism—into account cannot be deemed a move away from the increased protection of safety and health.

7. The agencies recognize that, as compared to the purpose of coloring, the objective of preservation played a relatively minor role prior to 1958, but assumed preeminent status upon promulgation of the May 1978 regulation. All the same, the agencies conclude, at least implicitly, that an alteration—no matter how drastic—in how the various purposes behind a regulation are "weighted" does not vitiate that regulation's prior-sanctioned status. The Court does not disagree with this conclusion.

nitrite regulations. Accordingly, the Court upholds the agencies' conclusion that the USDA's pre-1958 nitrite regulations were issued for both coloring and preservative reasons.

## B. *Color Additive Amendments*

■ The FDA has jurisdiction over all "color additives." 21 U.S.C. § 376. A "color additive," for purposes of the FDA Act, is defined as any "substance" which "when added . . . to a food . . . is capable (alone or through reaction with other substance) of imparting color thereto . . . ." 21 U.S.C. § 321(t). No exclusion from this definition exists analogous to the prior-sanction exemption from the term "food additive."

Plaintiffs contend that nitrite "imparts" color to bacon and thus is subject to the exclusive jurisdiction of the FDA. The defendants counter with three arguments. First, they maintain that nitrite does not "impart" color to bacon; it merely "fixes" bacon's natural color. Second, they claim that, under the current regulatory scheme, the color effects of nitrite in bacon are merely "incidental" to the substance's preservative qualities. Correspondingly, it is contended that the FDA lacks jurisdiction over substances which "impart color," but have other more critical functions. Third, some of the defendants maintain that, even if the FDA does have jurisdiction to regulate nitrite as a "color additive," the USDA retains concurrent jurisdiction to permit or require the use of nitrite in bacon as a botulism preventative.

Plaintiffs advance substantial arguments in opposition to these claims. As to the defendants' first claim, the parties have submitted detailed affidavits and reports. Plaintiffs point out, with affidavit support, that. the mechanism by which nitrite allegedly "fixes" the color in bacon is the same as the mechanism by which nitrite, according to the FDA, "imparts" color to poultry.

In response to the defendants' second argument, plaintiffs urge that the statute and the FDA's own regulations strongly indicate that, no matter how relatively minor is a substance's color effect, its other functions do not withdraw the applicability of the Color Additive Amendments. The "color additive" definition in 21 U.S.C. § 321(t) suggests that only two exemptions exist. One involves "pesticides" and has no application here. 21 U.S.C. § 321(t)(3). The other reads: the "term ["color additive"] does not include any material which the Secretary, by regulation, determines is used (or intended to be used) *solely* for a purpose or purposes other than coloring." (Emphasis supplied.) 21 U.S.C. § 321(t)(1). The FDA has promulgated regulations implementing this provision and they state that in order for the exemption to come into play:

> the material must be used in a way that any color imparted is clearly unimportant insofar as the appearance, value, marketability, or consumer acceptability is concerned. (It is not enough to warrant exemption if conditions are such that the primary purpose of the material is other than to impart color).

21 C.F.R. § 70.3(g). The regulations further state that the statute's definition of "color additive" "shall apply whether or not such ingredient has nutritive or other functions in addition to the property of imparting color." 21 C.F.R. § 70.3(f). These interpretations are consistent with statements made in an April 21, 1960, letter from the Secretary of HEW to the Chairman of the House Committee on Interstate and Foreign Commerce, which was included in the remarks made in the House prior to passage of the Color Additive Amendments of 1960. *See* 106 *Cong.Rec.* 14362, 14363 (June 25, 1960).

As to the defendants' third argument, plaintiffs maintain that Congress intended that all color additives be regulated exclusively by the FDA. *See* 21 U.S.C. § 601(m)(2)(D) (definition of "adulterated" in Meat Inspection Act); H.R.Rep.No. 1761, 86th Cong., 2d Sess., *reprinted in* 1960 U.S. Code Cong. & Admin.News 2887, at 2892. They further point out that, as noted earlier, color-inducing substances with other

useful functions are subject to the Color Additive provisions of the FDA Act. Finally, nothing in the Color Additive Amendments of 1960, its legislative history, or the FDA's implementing regulations appears to preclude the FDA from taking into account and weighing benefits other than coloring when that agency considers the wisdom of permitting the use of a color additive.

While these regulations and interpretations narrow and define aspects of the controversy, they do not permit the Court to resolve the issue. Facts are in dispute and elements of administrative discretion persist. Conscious of the doctrine of "primary jurisdiction," the Court declines to decide any of the issues raised by the plaintiffs under the Color Additive Amendments. *See United States v. Western Pacific R. Co.,* 352 U.S. 59, 63–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). The Court is not equipped—in the absence of some prior agency review of the matter—to ascertain the proper meaning to be given the phrase, "imparting color," or to determine how the color effects of nitrite in bacon might fit within any such definition. The other issues involve primarily a consideration of the FDA's own regulations and of the interrelationship between the Meat Inspection Act and the Color Additive Amendments of 1960. None of these matters was apparently presented to the USDA prior to its promulgation of the May 1978 regulation. The FDA has also apparently not had an opportunity to pass upon them. Consequently, the Court concludes that all of plaintiffs' claims under the Color Additive Amendments of 1960 must first be presented to and addressed by the FDA in consultation with the USDA. These two agencies possess the pertinent expertise and are charged with initially determining the meaning of the relevant statutory language.